STEWART, J.
*1106 On May 16, 2009, at about 6:30 p.m. on a residential street in Berkeley, California, a masked man exited a gold Cadillac occupied by three other men and fired 17 shots from a semiautomatic assault rifle at 25-year-old Charles Davis as he walked down the street after a trip to a store. The shooter hit Davis multiple times, from head to foot, killing Davis as the shooter's companions visibly celebrated, and then returned to the Cadillac. The four sped away but were quickly spotted by police, who pursued the Cadillac in a high-speed chase that ended in two collisions, killing a driver of another car, Todd Perea, and a pedestrian, Floyd Ross, Jr.
The four defendants in this appeal-Stephon Anthony, Samuel Flowers, Anthony Price and Rafael Campbell-were arrested and tried together in Alameda County Superior Court before a single jury that found them guilty of committing multiple murders and other crimes that day, including the first degree murder of Charles Davis and the second degree murders of Perea and Ross. The jury also found defendants intentionally killed Davis while they were active participants in a criminal street gang known as "North Side Oakland" (NSO), and committed that murder in order to further NSO's activities. The court's sentences included a sentence for each of them of life in prison without the possibility of parole for Charles Davis's murder.
*505 Defendants, separately and together, present many arguments for reversal of their convictions. They argue the prosecutor engaged in racially discriminatory peremptory challenges of prospective jurors. They argue the trial court erred in certain evidentiary rulings, including its admission of Anthony's incriminating statements to Oakland police, which they contend violated Anthony's rights under *1107 Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 ( Miranda ) and the other defendants' rights under People v. Aranda (1965) 63 Cal.2d 518, 47 Cal.Rptr. 353, 407 P.2d 265 ( Aranda ) and Bruton v. United States (1968) 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 ( Bruton ), and its admission of the People's gang expert's hearsay testimony, which defendants contend violated People v. Sanchez (2016) 63 Cal.4th 665, 204 Cal.Rptr.3d 102, 374 P.3d 320 ( Sanchez ) and Crawford v. Washington (2004) 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 ( Crawford ). They further argue the prosecutor engaged in many acts of misconduct in closing argument and the trial court committed several prejudicial instructional errors, including because of the recent enactment of Senate Bill Number 1437 (Senate Bill 1437), which changes the application of the natural and probable consequences doctrine to murder convictions. Defendants also argue we must remand to the trial court to give it an opportunity to exercise its discretion to dismiss or strike certain firearm and prior serious felony conviction enhancements for sentencing purposes.
We conclude some error occurred here, although not nearly as much as defendants claim. In the published portion of this opinion, we explain why the court erred under Miranda in admitting Anthony's statements to police on May 18, 2009, and erred under Sanchez and/or Crawford in admitting some of the gang expert's testimony, why these errors were harmless, and why defendants cannot raise their Senate Bill 1437 claim in this appeal before they have petitioned for relief in superior court under Penal Code section 1170.95.[1] In the unpublished portion of the opinion, we discuss defendants' other claims, most of which lack merit, and also conclude the other error that occurred was harmless beyond a reasonable doubt because of the overwhelming, admissible evidence that defendants were NSO gang members who traveled together, heavily armed and with masks, into the heart of their rival Berkeley gang's territory, there in broad daylight executed Charles Davis, the brother of a suspected Berkeley gang member, and did so to retaliate for what they thought was that gang's killing of one of their own NSO gang members a few weeks earlier. There was likewise overwhelming evidence that defendants then left together in the Cadillac with Anthony driving recklessly to try to evade police at high speeds and with disregard for traffic laws and the safety of others, resulting in the killing Perea and Ross as well. We affirm the judgments in their entirety, except that we remand to the trial court to allow it the opportunity to exercise its discretion to dismiss or strike the firearm and prior serious felony conviction enhancements.
*1108 BACKGROUND[2]
In a November 2010 information, the Alameda County District Attorney charged each defendant with five counts regarding the deaths of three people on *506 May 16, 2009. Count one alleged that each defendant murdered Charles Davis (§ 187, subd. (a) ) in a gang-related crime (§ 186.22, subd. (b)(4) ), making each defendant eligible for a sentence of life without the possibility of parole (§ 190.2, subd. (a)(22) ). A gang-related firearm use allegation was also attached to count one. (§§ 186.22, subd. (b), 12022.5, subd. (a), 12022.53, subds. (b), (c), (d), (e)(1), (g) ). The district attorney alleged in count two that each defendant murdered Todd Perea (§ 187, subd. (a) ) and in count three that each defendant murdered Floyd Ross, Jr. (§ 187, subd. (a) ). The district attorney further alleged in each of these two counts that Anthony personally and intentionally inflicted great bodily injury on the victim (§ 1203.075), and alleged in count three each defendant committed multiple murders, which also made him eligible for a sentence of life without the possibility of parole (§ 190.2, subd. (a)(3) ). The district attorney alleged in count four that each defendant caused the death of Ross while evading a peace officer ( Veh. Code, § 2800.3 ), and alleged the same in count five regarding Perea. The information also alleged that each defendant committed these crimes while on either felony probation or parole from state prison and had suffered prior convictions.
Defendants were tried together before a single jury in March and April 2013. The prosecution contended defendants were members of the NSO criminal street gang and acted together to murder Charles Davis on May 16, 2009, in order to avenge the April 23, 2009 shooting of a fellow NSO gang member, Nguyen Ngo, whom defendants believed was killed by a rival Berkeley street gang, and the possible attempted murders of Nguyen Ngo's brother, Bao Nguyen, who was also shot, but not fatally, and Anthony. Specifically, the prosecution contended that on May 16, the four defendants drove together, with two assault rifles, a semiautomatic pistol and homemade masks, in Anthony's gold Cadillac to West Berkeley. Sometime after 6:00 p.m., they came upon Charles Davis, who was walking on Allston Way near 10th Street. Charles had left his family's home on 7th Street in West Berkeley to buy a cigar at a local store. Charles was not a gang member, but he was the brother of Jermaine Davis,[3] suspected to be a member of the rival Berkeley gang and the shooter of Ngo. Flowers exited the Cadillac and, using an assault rifle, shot Charles from head to foot as another defendant drove the car around in a circle, another made celebratory exclamations and yet another *1109 held another rifle aloft. Flowers then returned to the car, which sped away. Moments later, police found Charles's dead body lying in the street on Allston Way, between 9th Street and 10th Street, which, according to the People's gang expert, was in "the heart" of the Berkeley Waterfront gang's territory.
At trial, the prosecution presented an eyewitness to the shooting, Timothy McCluskey. McCluskey testified that he was a retiree who lived with his wife in an upstairs flat of a house located near the intersection of 10th Street and Allston Way. Sometime after 6 p.m. on May 16, 2009, he sat down to watch television and opened a can of beer when he heard gunshots outside. He went out his front door and about halfway down the stairs. He heard more gunshots and saw the back of someone at the west end of Allston Way, on the south side of the yellow line on the street, firing at what McCluskey thought was a parked car. The shooter started to back up "right towards" McCluskey while *507 firing; McCluskey could see recoil as the shooter fired. McCluskey "kept popping in and out ... looking" from behind his door jamb. The shooter was wearing a hat that was "kind of Rastafarian with green, yellow and black" and very distinctive. At trial, the parties stipulated that the distance from McCluskey's porch to the area where, according to McCluskey, the shooter was standing was about 120 feet.
McCluskey saw a car come into the intersection of 10th and Allston, do "donuts," loop around the intersection and stop on 10th Street. At trial he remembered the car do at least one circle, although at the preliminary hearing he said it had done about three. Around the time the car drove around in a circle, the man in the front passenger-side of the car lunged out of the car window and "started screaming like 'Yahoo!' " in a "jubilant," "celebratory" manner. McCluskey said he saw this man's face. He identified him as Anthony at trial.[4]
McCluskey further testified that the shooter stopped firing, turned around and started running in McCluskey's direction. He was wearing a loose mask that covered the lower half of his face. As he ran, the shooter dropped some blue fabric. He ran back and picked it up, and his mask fell off. McCluskey saw his full face, that his hair was under the hat, and that the hat appeared to contain "substantial weight." The man looked directly at McCluskey and ran towards the car that had looped the intersection. McCluskey, still ducking out of the way at times, saw the man run towards the car's passenger side but did not see him get into the car. The car headed northbound on 10th Street. At *1110 trial, McCluskey hesitated for a moment as he identified Flowers as the shooter because, he said, Flowers was wearing glasses and had different hair. When Flowers removed his glasses, McCluskey said he had no doubt Flowers was the shooter.
A few moments after the shooting, McCluskey saw a police car drive down Allston Way and assumed it was pursuing the car involved in the shooting. He stopped the police car and told san officer the men had automatic weapons. McCluskey then went to see if he could help a person he saw lying in the street. He saw the person's face was "blown" off and the head had many gunshot wounds, realized he could not help and returned to the officer. He gave a statement to police about 45 minutes later. McCluskey described the shooter as an "Hispanic male or light-skinned black male" in his twenties, 5'8? to 5'10? tall and weighing about 150 pounds, thin and lanky, wearing a black, red and green Rastafarian knit cap.
That same evening, police brought McCluskey to the Berkeley Police Department. There, he identified the color of a blue towel shown to him as being familiar, although he had thought the fabric he had seen the shooter drop and pick up might have been a shirt or piece of cloth. He was also shown a cap at the police station, and at trial he identified a cap with orange, black, yellow and green stripes as consistent with the cap he saw on the shooter's head. He was also shown firearms, but did not recognize any of them as the weapon used by Flowers. Also, a Berkeley police officer testified that McCluskey told him shortly after the shooting that he saw the shooter pick up a white piece of fabric. McCluskey testified that he did not recall a white cloth.
*508 That evening, police also brought McCluskey to the hospital and showed him defendants Anthony and Price. He testified that he told police that night that he did not recognize either of them as the shooter. At trial, he acknowledged that he did not identify Anthony to police that night as the man who lunged out the car window. He said he recognized Anthony that night, but was not asked about anyone but the shooter, and acknowledged that he was irritated at the police that evening.
McCluskey further testified that at some time in the weeks following the shooting, he saw something on the news and on the "America's Most Wanted" television show. He also read something about the incident and saw a photograph of Flowers in the online publication "SF Gate." He did not recall if he saw photographs of anyone else because he focused on this photograph of Flowers, who he recognized right away as the shooter. He called a detective on the case to tell him Flowers was the shooter.
*1111 M'lisa Kelley testified that in May 2009 she lived with her husband and child in a building located on the corner of Allston Way and 10th Street. Sometime after 6:00 p.m. on May 16, 2009, she was in a back bedroom when she heard a "screeching" that sounded like tires, and then "some popping sounds." She went to her dining room window and looked out. She saw a fairly large, light-colored car stop near the center of the street a bit up from the corner. A brown hand was raised up on the rear driver's side of the car, either inside or outside the car, holding a dark, "long, skinny gun" with a "long snout" pointed at the sky. Kelley turned away for a moment and when she looked out the window again the car was gone.
A Berkeley police sergeant testified that at 6:34 p.m. on the day of the shooting, she heard a report over her car radio of possible gunshots in the area of 10th and Allston. She drove there and found the lifeless body of an African American male, shot in the head at least a couple of times, lying in the street. She heard a bystander "kind of blurt[ ] out that it was three or four black guys in a Cadillac; a gold Cadillac."
A forensic pathologist who performed an autopsy of Charles's body testified death was caused by multiple gunshot wounds from head to foot. At the scene, police recovered 17 shell casings of a caliber that was common for an AK-47 assault rifle.
A Berkeley police officer, Susan Lee, responded in her patrol car to a report of gunshots and came upon the Cadillac traveling at a high rate of speed near the scene of the shooting. During her pursuit, she saw Anthony was driving and a black male was sitting in the rear passenger-side seat wearing a Rastafarian hat. Lee pursued the Cadillac as it made its way to Sacramento Street and drove south. Other Berkeley police officers in their vehicles joined in pursuit. The Cadillac travelled at high speeds, drove at one point onto a grassy median on Sacramento Street to pass other cars and ignored stop signs.
Further testimony indicated that after being chased by police for about five to seven minutes, the Cadillac entered a busy intersection at Aileen and Martin Luther King, Jr. in Oakland at over 60 miles an hour and collided with a Mazda, killing the driver, Todd Perea. The two cars spun out of control, hit a third car, and the resulting mass hit a pedestrian, Floyd Ross, Jr., killing him too.
Bystanders witnessed the car chase. Kristina Cox was walking toward her car, which was parked on King Street near 62nd and Stanford in Berkeley. As she stood in the street, she saw a gold Cadillac traveling at about 50 miles an hour being pursued by law enforcement vehicles. As *509 the Cadillac passed her *1112 she saw a man whom she identified at trial as Campbell, sitting in the front passenger-side seat. He looked at her, shrugged and smiled, and did so a second time as the car went to the corner. At trial, Cox had no doubt that the man was Campbell.
Sierra Carter was walking her dogs along Aileen Street near Martin Luther King, Jr. Boulevard when she witnessed the last part of the car chase and the crashes. When the Cadillac came to a rest, she saw two people get out of the vehicle, look around, pull up their pants, and run directly towards her as she stood in front of a home where the front grass and sidewalk met, about six car lengths away. The two ran up the grass by where Carter was standing as they ran away. As they went by her, Carter focused her attention on them and made eye contact with them. At trial, she identified one of the men as Flowers and the other as Campbell.
Police arrested Anthony and Price at the scene of the crashes. One officer testified that as he approached the Cadillac, he saw Price, who was injured in the crashes, attempting to get out of the Cadillac from the left rear seat. The officer blocked the door. About a week later, police in Florida arrested Flowers on an unrelated charge, and learned an arrest warrant had been issued for him in California. About six months after the incident, police arrested Campbell in Sacramento.
The police recovered various items from the Cadillac, which was registered in Anthony's name. These included a blue towel from the rear driver-side seat and two other pieces of a white t-shirt, one on the driver-side floorboard and one on the front passenger-side floorboard.
Police found a Rastafarian cap on the front passenger-side floorboard of the Cadillac. Officer Lee testified that during her pursuit of the Cadillac she saw a passenger in the rear of the car wearing this cap, and McCluskey told a police officer the shooter was wearing that cap. A forensic scientist examined a bloodstain on the cap and sample cuttings from "six or eight" different areas of the cap, comparing them to reference specimens obtained from the defendants. He concluded Flowers was compatible as either a major or minor contributor of some of the cellular material on the sampled areas of the cap, but eliminated Flowers as the source of the blood on the cap. The scientist eliminated the three other defendants as significant contributors of any of this cellular material.
The police found two cell phones on the floorboard of the Cadillac, one belonging to Flowers and one belonging to Anthony, and also recovered a phone from Price. The People introduced at trial photographs that were found on these phones, as well as rap music with lyrics referring to NSO activities *1113 that were found on Flowers's and Price's phones. Investigators also examined the phones for contacts between defendants. From April 1 to May 16, 2009, they identified 136 communications between Flowers's phone and Anthony's phone, and 102 communications between Flowers's phone and Price's phone. Flowers last called Anthony the day before the May 16, 2009 incidents, on May 15, and last called Price on May 14. Investigators found 12 calls and 72 text messages from Anthony's phone to Flowers's phone, and one communication to Price. Anthony's most recent call to Flowers was on May 16, 2009, at 12:42 p.m.
Police also found a loaded, semiautomatic pistol in plain sight on the floorboard of the driver's seat of the Cadillac, and two semiautomatic assault rifles on the right front passenger-side floorboard, one empty and one loaded. As we will discuss, the police also found in the Cadillac a compact *510 disc (CD) of rap music, a sheet of rap lyrics, a funeral flyer for Ngo and several photographs, including of Ngo.
The jury found each defendant guilty of count one, the first degree murder of Charles Davis, and found the related gang and multiple murder special circumstances and firearm enhancement allegations to be true. It also found each defendant guilty of counts two and three, the second degree murders of Perea and Ross, and counts four and five, vehicular evasion of a peace officer causing the deaths of Ross and Perea. Defendants waived a jury trial on their prior conviction allegations and admitted the truth of those allegations.
Among the court's sentencing determinations was its imposition for all four defendants of a term of life in prison without the possibility of parole for committing multiple murders under section 190.2, subdivision (a)(3) and for the gang-related first degree murder of Charles under section 190.2, subdivision (a)(22), and a consecutive sentence of 25 years to life for the gang-related use of a firearm under section 12022.53, subdivision (e); a consecutive sentence of 15 years to life for Anthony and Flowers for each of counts two and three, the second degree murders of Perea and Ross respectively; a consecutive sentence of 30 years to life for each of these same counts for Price and Campbell; and, for all four defendants, two consecutive 10-year sentences for counts four and five, vehicular evasion of a peace officer causing the deaths of Perea and Ross respectively, which the court stayed.
Each defendant filed a timely notice of appeal.
*1114 DISCUSSION
I.-IV.**
V.
Admission of Anthony's May 18, 2009 Statements to Oakland Police Was Not Reversible Error Under Miranda.
Anthony argues the trial court prejudicially violated his constitutional rights under Miranda when it denied his motion in limine to exclude evidence of his statements to Oakland police on May 18, 2009, two days after his arrest in this case. We agree that the trial court erred, but conclude it was harmless.
A. The Relevant Proceedings Below
Prior to trial, the court held a hearing on Anthony's motion that his statements on three separate occasions to police-on April 23, 2009, May 17, 2009, and May 18, 2009-were inadmissible on Miranda and Aranda / Bruton grounds. The court denied Anthony's motion, except that it excluded his statements to Berkeley police on May 17, 2009.
1. Anthony's April 23, 2009 Statements to Oakland Police
Sergeant Sean Fleming, a homicide detective with the Oakland Police Department, testified at the motion hearing that on April 23, 2009, he was assigned to lead the investigation of the murder of Nguyen Ngo and the possible attempted murders of Stephon Anthony and Bao Ngo[24] that had occurred that day on the 800 block of 45th Street in North Oakland. That evening, he and another Oakland Police Department homicide investigator, Sergeant *511 Phillips, interviewed Anthony at the police department. Fleming did not advise Anthony of his Miranda rights because Anthony was only a victim and witness to the shooting. *1115 Anthony's April 23 interview with Fleming and Phillips was video-recorded, and the prosecution played it for the jury at trial.[25] Anthony told police he and Ngo arrived on 45th Street around Market Street in North Oakland to gamble with others. Fifteen minutes later, Ngo borrowed Anthony's car to go to a nearby store to buy dice. Upon his return, Ngo was shot by someone from a passing car as Ngo exited Anthony's car. Anthony and Bao were standing nearby. Ngo told Anthony the passing car was a Mercedes.
Anthony referred to Ngo as his "partner," "little partner," "best friend" and [o]ne of my best friends." He said they did not usually go to 45th Street because a shooting had occurred there, but they went there that day because Ngo used to live in the area, they were trying stay out of the way of the police and a gambling spot was there.
As his interviewers probed further about who could have shot Ngo, Anthony said, "We got problems with Berkeley. We got problems with the West," but he did not know who had done the shooting. Asked who "you all have funk with," "[l]ike real funk," Anthony responded, "We funking with Berkeley, always. I don't know why." Apparently referring to Berkeley gang members, he said "a few of 'em just got outta jail or somethin', " and indicated the "funk" was "seasonal." "That shit goin' kick off one time and then it's gonna fade off and then it's gonna kick off again. It's like, this the first thing of kickin' this shit off, right here." He said that in 2007, his friend "Steve" was killed at Emeryville High School and his "partner Rob" was shot coming out of a downtown club called "Jeffrey's" when "somebody had notified the people who he funking with ... and they caught him outside sleepin'." Asked if that was what happened with Ngo, Anthony said he was "not sure what was goin' on," thought "like maybe the motherfucker's tryin' to kick it off with us," and that he might have "to get to the bottom of this some way."
Anthony said his main issue was with "cats from ... Berkeley," but that he could not "put no face on this shit." He denied Ngo had done anything to cause someone to go after him. He said, "We don't even ride with guns. We haven't been ridin' with guns, lately," and added "that shit be dyin' down with ... Berkeley. It's always gonna be there. But it's gonna die down sometimes. And it'll pop back up. Maybe it could be poppin' back up." He did not know who killed Ngo, or whether he or Ngo was the intended victim. However, "these cats from ... Berkeley-you gonna hear about it. 'Cause typically, that's how this shit jump off. They come down here and do somethin' and then the word start to spread. And vice versa. ... Shit spread *1116 and that's what ... ignites more shit." He denied going to Berkeley or knowing his way around there, and said there was a greater police presence in Berkeley so they did not include Berkeley in their "missions."
Anthony continued that he did not know if the shooters were out to kill him. He speculated that if he was the shooter and "got funk with you," "I ain't gonna stop but I'm gonna make sure I'm gonna get you. If I get both a y'all, I mean, that's a, *512 that's a good day." The police told Anthony "it would not be wise to try to retaliate in a situation like this," to "let us handle this shit," and to call them if he learned information that could help their investigation.
2. Anthony's May 17, 2009 Statements to Berkeley Police
Sergeant Christian Stines of the Berkeley Police Department testified at the motion hearing that he was assigned to investigate the events of May 16, 2009. The next morning, May 17, he and Berkeley Police Sergeant Jim Counts interviewed Anthony.[26] After they asked some background questions, Counts advised Anthony of his Miranda rights using an admonition and waiver form. Counts directed Anthony to initial the form in certain places, but Stines did not see what Anthony wrote. Anthony was asked if he wished to speak to the officers. Stines could not recall the exact word Anthony used and thought Anthony's answer was unclear, but was led to believe Anthony answered in the affirmative because he continued the conversation and was responsive to the officers' questions.
Stines testified further at the hearing that before asking Anthony questions, he looked over at the admonishment and waiver form and saw Anthony had written "No" to whether he wanted to speak to the officers. Stines thought the meaning of this was unclear and tried to determine if Anthony understood his rights and wanted to talk to the officers. Anthony indicated he wanted to talk by continuing to do so, and by not indicating he did not want to continue. Stines proceeded to ask him questions about the case. About five minutes later, Anthony said, " 'I wish I had my attorney present,' " and " 'I don't have nothing to say to you.' " The officers did not ask him further about the case.
Detective David Marble of the Berkeley Police Department testified at the motion hearing that on May 16, 2009, he was assigned to lead the investigation into the killings of Charles, Perea and Ross. The next day, Marble photographed Anthony in his jail cell in order to document his injuries. At the time, Marble knew Anthony had already been questioned by two Berkeley *1117 police officers. In response to Anthony's question, Marble told him he was being charged with three counts of murder. Anthony said, " 'I didn't mean to kill those people. Man, I didn't mean for this to happen. They wouldn't stop chasing me. Why wouldn't they stop chasing me?' " Marble told him "that we pretty much knew what happened and who the other people were that were in [your] vehicle." Anthony responded, " 'I can't tell on them. They're my friends.' " Marble then said, " 'Rafael Campbell?,' " to which Anthony responded, " 'You're on the right track.' " Marble also told Anthony he knew Ngo had been killed three weeks earlier and that Anthony had everything to do with it. Anthony said "he was thinking about talking to detectives about the murder of Bao's brother." Marble told him to let the jail staff know if he decided to do that. Marble prepared a written report of this conversation, which the court reviewed.
3. Anthony's May 18, 2009 Statements to Oakland Police
Sergeant Fleming of the Oakland Police Department testified at the motion hearing that the Berkeley Police Department contacted him on May 18, 2009, and said "Anthony had requested to speak to us ...." The Oakland police obtained a removal order, picked up Anthony and took *513 him to an interview room at the Oakland Police Department, where Fleming and his partner, Sergeant Jones, interviewed Anthony.
Fleming further testified at the hearing that at the time of this May 18 interview, he knew Anthony was a suspect in a murder case in Berkeley that might be gang related, and he had heard "some things" that caused him to think the Ngo murder "possibly was related to a gang-related shooting." At the interview, Fleming told Anthony that they did not want to, and would not, talk about the Berkeley case. The officers did not ask Anthony about his Berkeley case, but instead "talked to him about the murder of Nguyen Ngo, and he was a victim/witness for that." Fleming did not advise Anthony of his Miranda rights. According to Fleming, Anthony was cooperative, responded to questions and volunteered information. He was not free to leave.
Anthony's May 18 interview with Fleming and Jones was recorded, and the recording was played for the jury. A transcript of the interview was provided to the jury, and it is contained in the record. It indicates Anthony was placed in an interview room before 5:49 p.m. and stayed there for the most part under physical restraints, with dinner provided to him, until Fleming and Jones began interviewing him almost five hours later, at 10:20 p.m. After some preliminary questions and talk about Anthony's high school football experiences, the officers and Anthony had the following exchange:
"[Fleming]: Okay. Hey, Stephon. So, um, remember I talked to you, uh, a few weeks ago, right? All right. Today um, guys from Berkeley called. They, *1118 uh, said you wanted to holler at us right? So I went and got this removal order signed by a judge. And that's why I came and swooped you up today, right? Hey, I just need to-just wanna explain to ya, we not here to talk-we know, I know you got some issues going on in Berkeley. We ain't here to talk about nothing about that, okay?
"[Anthony]: Yeah.
"[Fleming]: None of that, none of that we gonna speak on tonight, okay?
"[Anthony]: Hm.
"[Jones]: All right. 'Cause the rules are, once you, you know, once another agency arrests you, then you, you know, you invoked your right to counsel on ya. You know what that mean? When they start questioning, you ask for a lawyer?
"[Anthony]: Right. Yeah.
"[Jones]: Yeah. So when you do that other cops can't come in and try to talk to you about the shit. That's in the Constitution.
"[Anthony]: All right.
"[Jones]: So we just here to talk to you about the thing with, uh, Bao-I mean, uh ...
[¶] ... [¶]
"[Anthony]: 'Nugent.' "
Fleming then started asking Anthony questions about his friendship with Ngo, including how they met, how close they were, what Ngo was like and whether Anthony was "hurting" since Ngo was killed. Anthony said he had been very close to Ngo ever since he met him five years ago through two other friends, Rob Benjamin and Stevie Bailey. Ngo was a "thinker" who would think for everyone "in the whole car." Anthony had been "sick" since Ngo's death.
Fleming said he was trying to figure out what happened to Ngo and Bao that day. He also said he had talked by phone to Anthony a few times the previous week and had tried to get Anthony to come talk to him further. He then asked Anthony if *514 anything had happened in the last six months that might have caused the shooting. Anthony said "it was real hectic in '07," and "[w]e was losing people left and right. And then the situation had died down." Asked about 2008, Anthony said, "It never over, unless you just kinda *1119 back up." Prodded further, Anthony said "we" had "[n]o losses" that year, and that "[n]obody else is coming, shooting at us." Asked what started to happen in 2008 or 2009, Anthony said, "I actually, um, heard that a few, umm, cats from Berkeley went to jail. I guess they did pay a little time and got out." When Fleming asked if "these some cats that y'all have some issues with or something," Anthony said, "I mean, it's always, it's always been issues between Berkeley and North Oakland ...." He denied that "Nugent" (an apparent reference to Nguyen Ngo) or Bao had any issues with anyone when Ngo was shot.
Fleming asked Anthony a series of questions about what occurred on the day Ngo was shot. Anthony said just before the shooting, Bao noticed a blue Charger that "keep coming past" them. Anthony saw a man in the Charger talking on the phone named "Na Na," who was "from Berkeley." Asked, "So y'all been having problems with this 'Na Na' cat," Anthony said, "I guess they say he run Berkeley's side. Like if there's problems out there, he doling out the weapons and shit. Cars, rentals and shit. Telling 'em to go hit and shit. Orchestrating the hits." Anthony then said he wanted to be anonymous, and did not want to be recorded or for anything to be written down. Fleming commented again about Anthony's high school football experiences and then returned to the subject of Na Na.
Responding to further questions, Anthony said that about twenty seconds after he saw the blue Charger for the last time, another car came by, a gold "Benz," and a back door popped open. Anthony saw "long-ass dreads, black hoodie, cap, [and] some type of big gun" that could have been an AK or SK rifle and did not sound like a handgun. Shots were fired. Anthony put his head down and when he looked up, he saw a driver with dreads also and a person in the back seat; others told him there were three people in the car.
Asked who he heard did the shooting, Anthony said he heard Na Na orchestrated it and "they had somebody turn on us." He said a person who had been in jail with Berkeley people was at the scene that day, and speculated this person let the killers know he and Ngo were there. He thought the blue Charger was a diversion and that Na Na was talking on the phone to the Benz behind him. Asked, "Who you think shot y'all?," Anthony said, "Thurgood," because Anthony remembered that he "seen him and his bitch in that Benz on the freeway. ... That's his bitch Benz." Asked how he knew Thurgood, Anthony said Thurgood had shot "Stevie" at a bowling alley. "And, uh, from what we was hearing shit, when, when them Berkeley niggas was coming through shootin', they was saying 'Thurgood'-his name ... was popping up the most." A short time later, Anthony was shown a *1120 photograph of a person who the transcript identifies as Jermaine, and Anthony identified him as Thurgood.[27]
Anthony said he heard that "Joe from Berkeley" and his brother, "Coleon," who was "real tight" with Thurgood, were also in the Benz, along with a fourth person *515 named "Moose." Asked if they were "all Berkeley cats," Anthony said yes, except for Moose. Asked, "[H]ow did all this shit get started ... [l]ike why Berkeley and, uh, and North Oakland just can't get along?," Anthony said he did not know and that it had started some time ago. Later in the interview, the officers probed further about the rivalry between Oakland and Berkeley gangs. Jones said the rivalry was "like, traditional Crips and Bloods gangbanging," to which Anthony agreed. Jones said, "You, you from here. I'm from here. If I see you, it's on," and Anthony said, "It's ... not even no, 'We looking for this person or looking for that person.' When they was coming through shooting, they was looking for anybody from North Oakland. Anybody outside, they were shooting," whether in a gang or not. "Innocent people getting shot," he added.
Anthony also identified photographs of Joe and Coleon, identified in the transcript as photographs of "[Joseph Carroll] " and "[Coleon Carroll] ."[28] Asked why he thought they were involved in Ngo's shooting, Anthony said after the shooting "motherfuckers been getting phone calls like, 'Yeah, we did that shit. We on 7th sliding through right now.' Some shit like that." Anthony remembered that "Smarty" got a call from Coleon saying that "he on 7th sliding through," which Anthony said meant "they" were on "Sixth, 7th, down by University" in Berkeley.
In the middle of more questions about the shooting, Anthony was asked, "You all right, man?" He said, "The only reason why I'm tellin' y'all this information (unintelligible) kill, killed my little partner. Tried to kill Bao." Asked what it was "goin' to take for all this shit to stop," he said, "I don't even think it's going to stop." Jones said, "You don't think so? If 'Na Na,' 'Thurgood' and that little four or five group of dudes went to jail forever or they got killed or some other thing-it wouldn't stop still?" Anthony responded, "Yeah. It would probably stop. (Unintelligible). 'Cause I mean, if you trying to make a name for yourself in Berkeley, kill a North Oakland nigga." He continued, "just take the head off our body. Stevie was the head. Rob was the head. 'Nugent' like the motherfucking ribs. Seems like everybody that close to me been killed. That's like, that's a part of my body. I feel *1121 like, damn, the next thing you know, it'll be gone."[29] Asked, "Who do you think they was trying to hit when they came through there?," Anthony said, "I just know that them Berkeley niggas got a reputation for shootin' at North Oakland niggas no matter who the fuck it is. I think they was also trying to get a 'head' and score big. I mean, me, Bao and 'Nugent'-that's a big 'head.' Any one of us (unintelligible) like they be satisfied with any one of us."
The officers warned Anthony to be careful in Santa Rita jail. Anthony responded that he was not trying to be a snitch because "[t]hey'll kill me in jail." The interview ended a few moments later.
4. The Court's Rulings
After the testimony at the motion hearing was completed, Anthony's counsel argued that (1) the April 23 interview of Anthony in Oakland should be suppressed because Fleming did not give Anthony a Miranda warning, despite asking questions intended to obtain incriminating information about Anthony's gang affiliation and "funkin" with other gangs; (2) all of *516 the statements Anthony made to Berkeley police on May 17 after he indicated on the form that he did not want to talk with police should be suppressed; and (3) the May 18 interview of Anthony in Oakland should be suppressed because Anthony did not waive his previous day's assertion of his Miranda rights and the officers were trying to establish some type of motive for the killing of Ngo, knowing the May 16 shooting may have been in retaliation for that killing and for the simultaneous attempts to kill Anthony and Bao.
The court ruled the prosecution could not introduce in its case in chief any of Anthony's May 17 statements to Berkeley police after Anthony invoked his Miranda rights, including his statements to Marble, but could introduce Anthony's statements to Oakland police on April 23 and May 18.
Regarding the May 18 statements, the court found Anthony had invoked his Miranda rights under the Fifth Amendment the previous day, initiated the contact with Fleming and Jones, "certainly was in custody," "certainly" was subjected to an "interrogation," and was not re-admonished about his rights. These circumstances raised "complicated issues about reinitiation by a suspect." Citing Edwards v. Arizona (1981) 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, Oregon v. Bradshaw (1983) 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 and People v. Bradford (1997) 14 Cal.4th 1005, 60 Cal.Rptr.2d 225, 929 P.2d 544, it observed that Anthony reinitiated contact *1122 with "an investigation that he ... had previously spoke to the police about ... and ... it was not the reason he was in custody. ... Sure, it was related, but that's not why he was in custody. He was in custody for these murders, and he wanted to talk to the police about the murder of his friend, a subject he had previously spoken to them about. [¶] [The Oakland police] made clear to him that that's all they wanted to talk to him about, but they didn't re-admonish him." After hearing argument, the court concluded that the prosecution had shown "that on the facts here, Mr. Anthony was waiving his right to counsel to speak to the Oakland Police Department under the circumstances that he did. [¶] Now the fact that it results in information that [the prosecutor] wants to offer against Mr. Anthony is really not the question." Responding to further argument, the court acknowledged that as of the May 18 interview the Oakland police suspected Ngo's death was related to the events of May 16, but concluded, "that's not the analysis. The analysis is: Did Mr. Anthony waive his right to counsel? That's all I care about."
B. Analysis
1. The Trial Court Erred by Admitting Anthony's May 18 Statements in Violation of Miranda.
Anthony argues the trial court prejudicially erred by admitting his May 18 statements to the Oakland police in violation of Miranda because the police asked him questions designed to make him incriminate himself regarding the events of May 16. The People contend Anthony, although in custody for the May 16 events, voluntarily spoke as a witness to another crime and was not subjected to a custodial interrogation, making his prior assertion of his Miranda rights and the lack of another Miranda warning irrelevant. Further, they contend, Anthony impliedly waived any Miranda rights by initiating his talk with Oakland police. We conclude the trial court erred by admitting Anthony's May 18 statements because the Oakland police ignored his prior assertion of his Miranda rights and asked him questions they should have known could result in Anthony incriminating himself. However, we also conclude the error was harmless.
*517 We begin with the People's contention that the circumstances did not qualify for Miranda protection, even though Anthony was brought to the Oakland police department while he was in custody for the events of May 16. Relying on People v. Macklem (2007) 149 Cal.App.4th 674, 57 Cal.Rptr.3d 237, they argue we should determine if Miranda applies here by analyzing "whether the language summoning the defendant from his prison lodging was coercive, whether the physical surroundings of the questioning were unduly coercive, whether the defendant was confronted with evidence of guilt, and whether there was an opportunity given to this person to leave the site of the *1123 questioning." ( Macklem , at p. 687, 57 Cal.Rptr.3d 237, citing Cervantes v. Walker (1978) 589 F.2d 424, 427-428.) They further contend this analysis leads to only one conclusion: that Anthony was not subjected to a coercive interrogation that required Miranda warnings.
We agree that the Macklem analysis is appropriate here, but disagree with the People's conclusion. The trial court determined that Anthony was subject to a custodial interrogation, a factual finding to which we defer because it is supported by substantial evidence. ( People v. Bacon (2010) 50 Cal.4th 1082, 1105, 116 Cal.Rptr.3d 723, 240 P.3d 204.) Regardless of Anthony's request to speak to the Oakland police, he was removed to the Oakland police department under a court order and left in an interview room wearing physical restraints for virtually all of four and a half hours until Fleming and Jones began questioning him late in the evening of May 18. The two officers initiated and dictated the direction of their questioning; at no time did they ask Anthony why he, as Fleming put it, "wanted to holler" at them. (The record does not disclose Anthony's reasons either.) Instead, the officers began peppering Anthony with questions about the nature of his friendship with Ngo, his feelings about Ngo's death, and whether anything had occurred before Ngo's death that might have caused his shooting, including, following up on Anthony's own references, whether there were "issues" between some "cats" in Berkeley and "y'all." The officers also ignored Anthony's insistence during the interview that he did not want to be recorded. Also, Fleming testified that Anthony was not free to leave. The People fail to discuss why this evidence does not support the trial court's finding that Anthony was subjected to a custodial interrogation.
The People also argue Anthony was not the subject of a custodial interrogation because "[n]othing in Miranda precludes police from speaking freely to an incarcerated suspect, as long as ' "the speech would not reasonably be construed as calling for an incriminating response." ' " Citing People v. Dement (2011) 53 Cal.4th 1, 26-27, 133 Cal.Rptr.3d 496, 264 P.3d 292 ( Dement ), disapproved in part on another ground in People v. Rangel (2016) 62 Cal.4th 1192, 1216, 200 Cal.Rptr.3d 265, 367 P.3d 649, they contend that the officer's "limited questioning ... was not reasonably likely to elicit an incriminating response." Once more, we have no issue with the People's statement of the law but disagree with their conclusion. As Dement indicates, " ' "[i]nterrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " ( Dement , at p. 26, 133 Cal.Rptr.3d 496, 264 P.3d 292, quoting Rhode Island v. Innis (1980) 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297, italics added.) Dement, a prison inmate, invoked his Miranda rights to a detective investigating the death of an inmate named Andrews.
*518 ( Dement , at p. 25, 133 Cal.Rptr.3d 496, 264 P.3d 292.) A few hours later, after taking Dement to a hospital to treat his injuries, the detective *1124 asked him a question about an apparently unrelated homicide investigation in which Dement's wife had been questioned. ( Ibid . ) Dement expressed anger that the suspect in that case, Rutledge, had gotten his wife involved, said Rutledge and he were enemies, indicated Andrews was Rutledge's friend, said if law enforcement would get Rutledge into jail with the defendant, they would not have to worry about " 'the murders anymore' " or " 'taking him to court,' " and then would say nothing more. ( Ibid . ) The court concluded Dement made his incriminating statements in response to the detective's questions about a homicide the detective had no reason to believe was related to Dement, and not in an interrogation. ( Id . at pp. 26-27, 133 Cal.Rptr.3d 496, 264 P.3d 292.)
The circumstances discussed in Dement provide a sharp contrast to the circumstances before us, where the officers had reason to know that Ngo's shooting and the events of May 16 could be related. Fleming readily acknowledged in his testimony that when he questioned Anthony on May 18, he was aware Anthony was a murder suspect in a Berkeley case, that the case against Anthony might be gang affiliated, and that he had heard "some things" that caused him to think that the Ngo murder "possibly was related to a gang-related shooting." Further, Fleming had reason to suspect Ngo's death was related to a dispute between Oakland and Berkeley gangs. Anthony had told him this might be the case on April 23, saying he suspected the shooting was because "[w]e got problems with Berkeley," that "[w]e funking with Berkeley," that Berkeley gang members had just gotten out of jail and that perhaps "cats from ... Berkeley" were igniting "more shit." Indeed, on May 18, Fleming apparently already suspected Jermaine, Charles's brother, was involved in Ngo's murder, as evidenced by his showing Anthony Jermaine's photograph within moments of Anthony saying he suspected someone named "Thurgood" had killed Ngo.
In other words, the record indicates that when they questioned Anthony on May 18, Fleming and Jones had reason to believe Anthony was involved in a May 16 killing committed in gang-related retaliation for the April 23 shooting of Ngo, and the attempted murder of Anthony and Bao. Yet they did not advise Anthony of his Miranda rights and pursued lines of questioning that called for Anthony to give responses that bore directly on his motive and intent and were thus incriminating-asking, for example, about Anthony's relationship with Ngo, with his feelings about Ngo's death, the "issues" between "cats" from Berkeley and "y'all," and the rivalry between Oakland and Berkeley gangs. The People's contention that these lines of questioning were not reasonably likely to elicit an incriminating response from Anthony lacks merit.
The People's contention that Anthony waived his Miranda rights is equally unpersuasive because there is no indication Anthony made a knowing *1125 and intelligent waiver of his Miranda rights. "If ... a defendant ... requests counsel, 'the interrogation generally must cease until an attorney is present.' ... However, if the defendant thereafter initiates a statement to police, "nothing in the Fifth and Fourteenth Amendments ... prohibit[s] the police from merely listening to his voluntary, volunteered statements and using them against him at the trial." [Citation.] Moreover, if the defendant's statement is not only voluntary, but constitutes a knowing and intelligent waiver of *519 his right to see counsel, the interrogation may resume. [Citation.] Such a knowing and intelligent waiver is "a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " ' [Citation.] The state must demonstrate that the suspect knowingly and intelligently waived his right to counsel 'under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.' [Citation.] .... [T]he initiation of a conversation with officers, although not dispositive, 'is strong and essential evidence of a knowing and intelligent waiver.' '[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " ( People v. Hensley (2014) 59 Cal.4th 788, 810, 175 Cal.Rptr.3d 213, 330 P.3d 296.)
Here, Anthony asked to speak to the Oakland police, but, again, we do not know why, and Fleming and Jones never asked him. Rather, they confirmed with him his assertion of his Miranda rights in the Berkeley case and assured him they would not ask him questions about that case-in effect promising they would not ask him questions that could cause him to incriminate himself in that case. Specifically, referring to the Berkeley case, Fleming said, "None of that, none of that we gonna speak on tonight, okay?" And after Anthony agreed, Jones said, "Yeah. So when you do that other cops can't come in and try to talk to you about the shit. That's in the Constitution." Nonetheless, Fleming and Jones proceeded to question Anthony about matters that were potentially incriminating in the Berkeley murder case. Their references to his Oakland gang activity and probing of his suspicions that Berkeley gang members, particularly Jermaine, killed Ngo were obviously relevant to Anthony's motive and intent for his suspected participation in the murder of Jermaine's brother, Charles, on May 16. In other words, Fleming and Jones confirmed with Anthony that he had asserted and continued to assert his Miranda rights, assured him that they would not ask him questions about matters that could cause him to incriminate himself in the Berkeley case, and nonetheless proceeded to ask him questions about matters that could cause him to incriminate himself in the Berkeley case. Under these circumstances, Anthony cannot be said to have made a knowing and intelligent waiver of his Miranda rights. To the contrary, he confirmed his assertion of those rights and proceeded to answer the officers' questions upon their representation that they *1126 would not ask questions that implicated these rights. At best, Fleming and Jones ignored Anthony's assertion of his Miranda rights and interrogated him about matters they knew or should have known would be incriminating. The law prohibits them from doing so. ( Dement , supra , 53 Cal.4th at pp. 26-27, 133 Cal.Rptr.3d 496, 264 P.3d 292.) The court should have granted Anthony's motion in limine regarding the May 18 interrogation.
2. The Trial Court's Error in Admitting Anthony's May 18 Statements in Violation of Miranda Was Harmless .
We conclude the trial court's error in admitting Anthony's May 18, 2009 statements to the Oakland police was harmless beyond a reasonable doubt. Other evidence provided ample support for his convictions. There is no doubt that Anthony was on the scene for all of the May 16 incidents. The Cadillac used in Charles's murder was registered in Anthony's name. Officer Lee identified him as the person driving that car moments after Charles's murder. Anthony was apprehended at the scene after *520 his vehicle crashed. His cell phone was found in the car. The evidence further indicates Anthony was among the persons in the Cadillac who celebrated as Flowers repeatedly shot Charles to death and was the person who drove the Cadillac with a conscious disregard for human life as the four fled from police, resulting in the deaths of Perea and Ross.
Further, the admissible evidence of Anthony's affiliation with the NSO gang is very strong. We have already discussed Anthony's April 23 statements to the Oakland police, including those suggesting he and Ngo engaged in gang activities and that he suspected Berkeley gang members had killed Ngo as part of a long-standing, violent conflict between NSO and the Berkeley gang. In addition, Fleming testified that on April 23, 2009, when he interviewed Anthony about Ngo's killing, Anthony showed him a "Bushrod" tattoo on his arm. Cunnie, the People's gang expert, later testified "Bushrod" was a subset of NSO. And all of this was by no means the only admissible evidence of Anthony's NSO affiliation; we will discuss more of this evidence in addressing the admissibility Cunnie's expert testimony, post .
Finally, Anthony's statements on April 23, 2009, to Oakland police, the voluntariness and admissibility of which he does not challenge on appeal, indicate he had a motive to participate in the NSO-related murder of Charles. That is, he suspected a rival Berkeley gang of which Charles's brother was a *1127 member was responsible for shooting and killing his close friend Ngo and attempting to kill him and Bao.[30]
Given the admissible evidence, the court's error in admitting Anthony's May 18 statements to the Oakland police was harmless beyond a reasonable doubt.
VI.***
VII.
None of Cunnie's Gang Expert Testimony Is a Ground for Reversal .
Defendants, with Flowers taking the lead, argue the trial court committed prejudicial error under Sanchez , supra , 63 Cal.4th 665, 204 Cal.Rptr.3d 102, 374 P.3d 320, which was issued after the trial in this case, and Crawford , by allowing the People's gang expert, John Cunnie, to testify about inadmissible case-specific, and sometimes testimonial hearsay to establish defendants' NSO affiliations and their related motives, intents and activities. This evidence formed the basis for the jury's finding that the murder was gang-related and the resultant sentences of life without the possibility of parole under section 190.2, subdivision (a)(22) and consecutive 25-years-to life terms for the gang-related use of a firearm under section 12022.53, subdivision (e). We reject a number of defendants' arguments and conclude, assuming for the sake of argument that the trial court erred in some regards under Sanchez , Crawford and/or Miranda , these errors were harmless under both federal and state standards. Other evidence properly admitted at trial, including that part of Cunnie's expert testimony we conclude was properly admitted, overwhelmingly establishes *521 defendants acted together as active NSO participants in furtherance of NSO's objectives in committing the first degree murder of Charles. *1128 A. The Relevant Proceedings Below
Before trial, defendants brought in limine motions to limit the prosecution's proposed gang expert evidence. The court conducted a hearing under Evidence Code section 402 to hear the prosecution's proposed gang expert testimony by Cunnie. Afterwards, defense counsel argued, among other things, that Cunnie's proffered testimony improperly relied on hearsay and double hearsay, such as information obtained "through other officers, through perhaps double hearsay through what other officers derived from witnesses and gang members that they were conversing with, detaining, arresting; through his own instances in which he had detained, made contact with, arrested gang members, and/or conversed with witnesses." Defense counsel also objected to admission of some of the evidence on Crawford grounds.
The court thought some of the evidence Cunnie relied on, such as "certified convictions [and] independent evidence of the commission of crimes," was excepted from the hearsay rules. It stated regarding constitutional evidentiary questions that it was "bound by the ruling in [ People v. Gardeley (1996) 14 Cal.4th 605, 59 Cal.Rptr.2d 356, 927 P.2d 713 ] that the information relied on by [Cunnie] is not received for its truth." It indicated it would fashion an appropriate jury instruction and that the question for the jury was, "Is the information that [Cunnie's] relying on the sort of information that an expert in his field would reasonably rely on?" The court found that "everything [Cunnie] talked about" at the Evidence Code section 402 hearing was the type of information that someone in his field would reasonably rely on in forming an opinion. It ruled that various types of evidence were admissible in presenting Cunnie's expert testimony, including "the conversations with colleagues, the conversations with people on the street, the reading of police reports, the consulting taped and video audio statements of the defendant or other suspects in related crimes, et cetera, the examining the neighbors for graffiti, all these sorts of things that he talked about seems to me are the type of information that are reasonably relied upon ...." The court added, "I understand some of that information may not properly be received for its truth, but only for its effect on the expert."
Before trial, Flowers also objected to the admission, via Cunnie's testimony, of a statement in an exhibit, apparently a police report, that Flowers had been in possession of an assault weapon during a 2008 incident that led to his arrest and conviction for possession of marijuana for sale. Flowers argued this evidence was unduly prejudicial under Evidence Code section 352. The court ruled the evidence was admissible.
At trial, Cunnie testified as a gang expert about matters that we will soon review in greater detail, including the history and primary activities of NSO
*1129 and its rivalry with Berkeley; the meaning and significance of numerous items and facts that were separately introduced into evidence; whether defendants were NSO gang members in 2009; and whether perpetrators described in a hypothetical based on the prosecution's factual allegations committed crimes for the benefit of a criminal street gang and with the specific intent of promoting or further assisting criminal conduct by gang members.
Defendants renewed their hearsay objections during Cunnie's trial testimony. This resulted in the trial court's admonition *522 to the jury "to understand that an expert is permitted to consider information that might not necessarily be otherwise admissible," including hearsay, and that the court would instruct the jury further about its consideration of the expert's testimony. Defendants also all made a continuing objection to what one counsel characterized as "inadmissible hearsay regarding information [Cunnie] took from reports, police reports, statements from any witnesses, and/or any audiotaped statements he reviewed or jail calls, any audiotape as constituting a violation of [defendants'] Sixth and Fourteenth Amendment right."
The court admonished the jury that Cunnie's "testimony is being offered ... not as character evidence, not to establish in any way that anybody is a bad person or has a character for violence to commit crime or anything like that. ... [¶] It's offered very specifically on the question of the gang allegations that are contained in the Information, the charges that have to do with whether or not the crimes that are alleged were committed ... in association with, in furtherance of, or for the benefit of a criminal street gang." The court added that Cunnie's testimony was also "being received on the question of a motive to commit the charged offenses."
After Cunnie testified, the court held a hearing outside the jury's presence to review the prosecution's proffered exhibits. The court admitted all of the exhibits the prosecutor showed to Cunnie that we will discuss, post .[32]
B. The Legal Standards
In Sanchez , which the Supreme Court decided three years after the trial of this case, the court created a new paradigm for the presentation of *1130 gang expert testimony. ( Sanchez , supra , 63 Cal.4th at p. 679, 204 Cal.Rptr.3d 102, 374 P.3d 320.) Before Sanchez , an expert was given the latitude to testify both about general background information and about case-specific out-of-court statements in order to explain the basis for his or her expert opinion, and the court typically would instruct the jury to consider the information for that purpose only, and not for its truth. ( Id. at pp. 679, 683, 204 Cal.Rptr.3d 102, 374 P.3d 320, citing People v. Gardeley , supra , 14 Cal.4th 605, 59 Cal.Rptr.2d 356, 927 P.2d 713.) In Sanchez , the court eliminated this latitude with respect to case-specific facts, which it defined as facts "relating to the particular events and participants alleged to have been involved in the case being tried." ( Id . at p. 676, 204 Cal.Rptr.3d 102, 374 P.3d 320.) It reasoned that when no other and competent evidence of those facts is offered, "there is no denying" that the hearsay statements relayed by the expert are being offered for their truth. ( Id . at p. 684, 204 Cal.Rptr.3d 102, 374 P.3d 320.) Indeed, the jury in Sanchez had been instructed that, in assessing the believability of the expert, it " 'must decide whether information on which the expert relied was true and accurate.' " ( Id. at p. 684, 204 Cal.Rptr.3d 102, 374 P.3d 320 ; CALCRIM No. 332.) While the jury had also been *523 instructed that the hearsay statements on which the expert relied should not be considered " 'proof that the information contained in those statements was true,' " that instruction was in conflict with the first one and could not logically have been applied. "[The jury] cannot decide whether the information relied on by the expert 'was true and accurate' without considering whether the specific evidence identified by the instruction, and upon which the expert based his opinion, was also true." ( Sanchez , at p. 684, 204 Cal.Rptr.3d 102, 374 P.3d 320.) The state law evidentiary rule established in Sanchez , simply stated, is that out-of-court statements about case-specific facts may not be relayed by an expert witness unless they fall within an exception to the hearsay rule. Absent an exception, the case-specific facts must be established by competent (non-hearsay) evidence presented by other witnesses and the expert's opinion may be based on a hypothetical question that assumes those facts. ( Ibid . )
In Sanchez , the court also addressed the Sixth Amendment's confrontation clause, as interpreted by the United States Supreme Court in Crawford and its progeny. ( Sanchez , supra , 63 Cal.4th at pp. 685-686, 204 Cal.Rptr.3d 102, 374 P.3d 320.) Admission through an expert of hearsay statements concerning case-specific facts, the court opined, not only would violate the Evidence Code but, if the hearsay statements were testimonial and Crawford 's exceptions did not apply, would also violate the Sixth Amendment. ( Sanchez , at p. 685, 204 Cal.Rptr.3d 102, 374 P.3d 320.) A "testimonial" statement is one made when the circumstances objectively indicate there is no ongoing emergency, and the "primary purpose" of the interrogation or other conversation " 'is to establish or prove past events potentially relevant *1131 to later criminal prosecution.' " ( Ohio v. Clark (2015) 576 U.S. ----, 135 S.Ct. 2173, 2179-2180, 192 L.Ed.2d 306 )[33]
The Sanchez court established a two-step analysis for determining the admissibility of out-of-court statements. "The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the Crawford limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is testimonial hearsay , as the high court defines that term." ( Sanchez , supra , 63 Cal.4th at p. 680, 204 Cal.Rptr.3d 102, 374 P.3d 320.)
The Sanchez court's hearsay analysis focused on an expert's testimony about the truth of case-specific facts, and not on the expert's reliance on these facts to form his or her expert opinion. The court emphasized that an expert "may still rely on hearsay in forming an opinion, and may tell the jury in general terms that he did so." ( Sanchez , supra , 63 Cal.4th at p. 685, 204 Cal.Rptr.3d 102, 374 P.3d 320.) "What an expert cannot do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." ( Id . at p. 686, 204 Cal.Rptr.3d 102, 374 P.3d 320.) The court also affirmed the long-standing *524 rule that expert witnesses have greater latitude than lay witnesses to testify about "generally accepted background information" ( id. at p. 676, 204 Cal.Rptr.3d 102, 374 P.3d 320 ), even when that information is based on hearsay: "In addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc." ( Id . at p. 675, 204 Cal.Rptr.3d 102, 374 P.3d 320.) "An expert may ... testify about more generalized information to help jurors understand the significance of ... case-specific facts." ( Id . at p. 676, 204 Cal.Rptr.3d 102, 374 P.3d 320.)
C. Analysis
Defendants contend that most of Cunnie's expert testimony about their NSO affiliations and related activities was inadmissible. We conclude that, assuming some of his testimony was inadmissible, particularly in light of Sanchez , much of it was admissible because it related to his own background or to generalized information acquired through his training and experience, or represented his expert opinion about facts established through evidence that *1132 was admitted at trial independent of his testimony. We first describe the testimony of Cunnie that was admissible.
1. Background Information
Cunnie testified that he had been a police officer with the Oakland Police Department for four and a half years ending in 2011, and was at the time of trial an officer with the San Francisco Police Department. He began his work in Oakland patrolling East Oakland and was moved to North Oakland in 2008, where he patrolled for about six months (as well as for a brief time later). He was then assigned to a North Oakland "problem-solving officers unit," where he worked for most of the remainder of his time with the department, during which "we encountered a lot of gang activity." Cunnie received training regarding gangs from the statewide police academy, the Alameda County Sheriff's Department, the California Narcotics Officers Association, San Francisco's gang task force, the Los Angeles City Attorney's Office and senior members of the Oakland Police Department. He also had helped train officers to investigate gang-related crime. He was allowed to testify as an expert in the identification of gang-related crimes in Oakland, and regarding NSO's rival gangs in Berkeley.
Cunnie testified that he had been involved in at least 15 gang-related investigations in Oakland, had made arrests of gang members in gang-related crimes, had spoken to about 15 people who admitted their association and membership in criminal street gangs and was familiar with signs and symbols used by Oakland gangs. He remained current with Oakland gang culture, trends and habits through 2009. He had assisted the Oakland City Attorney's office throughout that year and part of 2010 in its successful efforts to obtain a civil gang injunction against 15 NSO members. He had previously qualified in the courts of the state as an expert in NSO and Berkeley rival gangs.
2. Information Acquired Through Training and Experience
Cunnie testified that he was familiar with NSO, which was an informal North Oakland criminal street gang that started in 2001, had about 50 to 60 members, and claimed as "turf" the North Oakland streets with numbers in the 40s, 50s and 60s. NSO gang members primarily engaged in "gang crimes, including assaults, murders, robberies, burglaries [and] drug *525 dealing," as well as assault with firearms, felony evasion from police, armed robbery and ex-felon possession of firearms. Firearms were a "big tool" for NSO gang members, which they used to protect themselves from rival gangs, to intimidate people within their turf and to assault rival gang members.
Cunnie further testified that NSO was an "umbrella gang" with subsets that had an allegiance to it. Its "three major subsets" were "Bushrod, Gaskill, and *1133 ASAP/FT." The Bushrod subset was located around Bushrod Park at 59th and Shattuck in North Oakland. Its members sometimes referred to themselves as "Cold Gunnaz," in keeping with the "North Pole-Ice City theme" that NSO members used. Bushrod was the oldest, most established subset of NSO. Gang members' referred to Bushrod as "5-9 ... or 5900 or the word 'Bushrod.' " Gaskill was centered around Gaskill Street in North Oakland, east of San Pablo Avenue and from 53rd Street to Stanford. ASAP started around 2007, when some members of the "Ghost Town" gang, located around 29th and 30th Streets in Oakland, moved uptown to Apgar Street to sell drugs, and then helped form ASAP. The area around 45th and Market in North Oakland was ASAP gang territory. FT was established before ASAP, but the two later became "kind of became synonymous."
NSO was also known as " 'Ice City' " or " 'the North Pole,' " and NSO gang members referred to themselves as " 'Polar Bears.' " Members used NSO-related graffiti to mark their territory, as indicated in photographs Cunnie took around North Oakland in 2009 and which he reviewed at trial. NSO gang members referred to "cold nights" in North Oakland as meaning "everybody [was] cool with each other." The phrase "NSO 456," sometimes used by gang members, referred to the streets in the 40s, 50s and 60s of North Oakland, and showed the gangs and subsets in those areas all claimed allegiance to NSO.
NSO gang members had NSO-related tattoos, which were "critical" in gang culture because they "show everlasting loyalty to the gang." Gang members also wore NSO-related clothing. For example, ASAP gang members wore "A's" baseball hats, using the "A" symbol to represent ASAP. Gang members commonly memorialized murdered gang members in clothing and tattoos. NSO gang members used "gang hand signs" as a "nonverbal way of communicating allegiance to the gang or showing what gang you're a part of." NSO and some of its subsets, such as ASAP, had their own signs. Cunnie testified about numerous photographs that were admitted into evidence elsewhere during trial that depicted certain persons Cunnie said were affiliated with NSO who had NSO-related tattoos like "Ice City," wore A's hats, wore clothing with NSO-related symbols and made various NSO-related hand signs.
Cunnie further testified that he had talked to "NSO gang members who talk about Berkeley as their rival or that they need to be on the lookout for Berkeley gang members." The story Cunnie had heard most often was that the dispute between the gangs dated back to 2002, when a dispute erupted between an NSO and Berkeley Waterfront gang member and turned violent the following year. In the spring of 2010, Cunnie worked directly with Berkeley police in a two-week joint operation "where we spent time in *1134 Berkeley and North Oakland to try and make arrests to curb some of the violence between the two gangs." According to Cunnie, the intersection of 10th and Allston in Berkeley, where Charles was shot to death, was the heart of the Berkeley Waterfront gang territory. *526 3. Testimony About Evidence Admitted Independent of Cunnie's Testimony
Under Sanchez , Cunnie could testify about his expert opinion regarding evidence that was properly admitted elsewhere at trial, independent of his testimony. (See Sanchez , supra , 63 Cal.4th at p. 684, 204 Cal.Rptr.3d 102, 374 P.3d 320.) Cunnie testified about two such categories of evidence-evidence that was relevant to defendants' conduct, but which was not specific to a particular defendant, and evidence that was specific to a particular defendant. Cunnie testified about items recovered from defendants and the Cadillac after the crashes. Along with the NSO-related rap lyrics found on Price's and Flowers's phones that we have discussed in the unpublished portion of this opinion, this also included what looked like a funeral flyer for Ngo on which were pictures of Ngo displaying the FT and ASAP hand gang signs, and there were also photographs of Ngo and Bao with one of them displaying gang hand signs. Cunnie said about one of the brothers, "In some of them he was in a group; in some of them he was displaying gang hand signs. Some of the photos ... ended up on the funeral flyer ...."
Cunnie also testified about independently admitted evidence that pertained to Anthony, Flowers, Price and Campbell, and indicated each was affiliated with NSO. Regarding Anthony, Cunnie testified that a photograph of Anthony's jail cell wall taken in 2010 showed a handmade drawing with " 'Polar Bear' " written across the top and a head in the center of a $100 bill with the serial number "NP 005900," a possible reference to "North Pole" and the 5900 block of Shattuck, the location of Bushrod Park.[34] Photographs found on Anthony's phone depicted a watch called "Ice Time" and Ngo making an FT gang sign with his right hand. Cunnie also testified that he found photographs on the MySpace page of a third party depicting Anthony wearing a gray hat with an A's symbol, another individual "throwing" the ASAP gang hand sign, and Ngo and Bao.
Cunnie also opined that a number of Anthony's statements during his April 23, 2009 interview with Oakland police-which were admissible-were *1135 indicative of his gang activity and his concerns about Berkeley gangs. These included Anthony's statements that "[w]e got problems with Berkeley" and that "[w]e haven't even been riding around with guns lately." Cunnie said a "Bushrod" tattoo on Anthony's right forearm, shown in a photograph, was a reference to Bushrod Park or the Bushrod subset of NSO and showed "allegiance to NSO and particularly the Bushrod subset." Cunnie also said he was aware that Anthony had been convicted of burglary in 2007, which the prosecution established by introducing a certified copy of a court document.
Regarding Flowers, we have already discussed in the unpublished portion of this opinion Cunnie's testimony about the NSO-related rap lyrics found on his phone. Cunnie also testified about numerous photographs indicating Flowers was affiliated with NSO. These included photographs of Flowers's "Ice City" stomach tattoo; a tattoo on his left forearm of a $100 bill and the "A's" symbol; tattoos on Flowers's right and left forearms of the terms "bona *527 fide" and "hustler," which, Cunnie said, read together, represented "the values of gang lifestyle," as did Flowers's "dis-honor" tattoo; Flowers displaying the FT and ASAP gang signs; Flowers displaying the ASAP gang sign wearing an A's hat; and Flowers displaying a hand sign Cunnie had seen NSO gang members display. An image of Flowers was also included on the front of the funeral flyer for Ngo.
Cunnie also testified about Flowers's conviction in 2008 for possession of marijuana for sale under Health and Safety Code section 11359. The prosecution introduced a set of certified court documents that established this conviction, which were admitted independent of Cunnie's testimony. Further, those court documents indicate Flowers had weapons when he was taken into custody, as they include the court's pronouncement at sentencing that "[d]efendant's weapons and ammunition are ordered destroyed."
Regarding Price, we have also already discussed in the unpublished portion of this opinion Cunnie's testimony about the NSO-related rap lyrics found on his phone. Cunnie also testified about photographs admitted into evidence elsewhere during trial that depicted a tattoo on Price's left shoulder stating " 'Polar Bear Price' "; a tattoo on Price's right shoulder stating "BRP," a reference to "Bushrod Park"; a tattoo across Price's back stating "Bushrod"; a tattoo stating " 'Loved by few, hated by many, respected by all' " next to a banner stating "5900," which Cunnie interpreted as a reference to the 5900 block of Shattuck; and Price and another individual displaying an NSO gang sign. Also, the prosecution introduced into evidence a certified copy of an abstract of judgment indicating Price was convicted of robbery in 2004. Cunnie testified that shortly after Price was released from prison, Cunnie encountered him as a passenger in a car driven by a third party wearing a "Bushrob" shirt, suggesting gang membership.
*1136 Regarding Campbell, Cunnie testified about several photographs that indicated Campbell was affiliated with NSO. These included photographs showing Campbell with a group of individuals, including Bao displaying an FT hand gang sign; a gang tattoo on Campbell's stomach that referred to the 5700 block of Gaskill in North Oakland, Gaskill gang territory; tattoos on Campbell's right and left arms that state " 'Pola,' " an abbreviation for " 'Polar' " and "bear"; and a tattoo on the inside of Campbell's left forearm stating "live now" and "die later" around the drawing of a skeleton, which generally reflected gang values. The prosecution also introduced a certified copy of an abstract of judgment showing Campbell was convicted of robbery in June 2003.
Cunnie's expert testimony about criminal street gang behaviors generally further established that defendants' actions on May 16 were gang-related. As we have already described, evidence admitted independent of Cunnie's testimony established that about three weeks after Ngo's murder, defendants drove together to Berkeley with two semiautomatic assault rifles and a semiautomatic pistol in the car, Flowers exited the car and shot Charles to death as one defendant drove the car in a circle, another shouted in exultation and another held a rifle up in the rear driver-side area of the car, and the four then fled together in the car as Anthony drove recklessly, attempting to evade pursuing police cars at high-speeds, resulting in Perea's and Ross's deaths. Cunnie testified that a gang rival's killing of a gang member is an act of disrespect that in gang culture requires a response to avoid the appearance of weakness. The response often involves use of firearms in the rival gang's territory. Also, "committing crimes with other *528 gang members is common because it's strength in numbers." Further, "[o]ften ... in this gang rivalry, if they can't find the attended [sic ] target, they'll settle for someone they know who is associated with their intended target, either a fellow gang member or someone that's associated with them." And if police were to pursue a gang or gang members, "submitting to police control would be a sign of weakness."
At the conclusion of Cunnie's direct examination, the prosecutor asked Cunnie to assume a hypothetical that closely tracked the prosecution's theory of what happened in this case and was supported by admissible evidence. An expert may be asked to assume a hypothetical set of case-specific facts for which there is independent competent evidence and testify about what conclusions can be drawn from those facts. ( Sanchez , supra , 63 Cal.4th at pp. 676-677, 204 Cal.Rptr.3d 102, 374 P.3d 320.) The prosecutor's hypothetical included that criminal street gang members retaliated against a rival gang that had shot at their members a few weeks before, killing one of them, by driving together into the heart of the rival gang territory in daylight and shooting to death the brother of one of the rival gang members using one of the semiautomatic rifles they armed themselves with, and then attempted to evade pursuing police by engaging in a high speed chase that resulted in two other people being killed. The *1137 prosecutor asked Cunnie if in his opinion these crimes were committed for the benefit of a criminal street gang and with the specific intent to promote or further assist criminal conduct by gang members. Cunnie answered in the affirmative.
Finally, based on his review of the evidence we have discussed, as well as on his review of case-specific hearsay evidence we will discuss post , Cunnie had "no doubt" that Anthony, Flowers, Price and Campbell were NSO gang members in 2009.[35]
4. Defendants' Arguments Regarding Cunnie's Expert Testimony
Defendants, mindful that Cunnie's expert testimony about NSO, criminal street gang activities, defendants' NSO affiliations and their gang-related activities was an important part of the People's case against them, argue that virtually all his testimony was based on case-specific and/or testimonial hearsay and thus was inadmissible under Sanchez and Crawford . We conclude defendants fail to establish error regarding some of these claims, and that errors they do identify were harmless in light of the admissible, devastating evidence of their NSO activities and participation in the murders of Charles, Perea and Ross.
a. Defendants Do Not Establish Error Regarding Some Claims.
Defendants incorrectly challenge five categories of testimony by Cunnie as based on inadmissible hearsay.
First, they raise Sanchez challenges to some of the evidence we have recounted above that was admissible background information based on Cunnie's training and experience or evidence admitted elsewhere during trial independent of Cunnie's testimony. Specifically, they challenge Cunnie's discussion of the general history of the violent rivalry between NSO and the Berkeley gang, including information Cunnie obtained from other officers, investigators and purported gang members, *529 which the prosecutor referred to in his hypothetical. Defendants are incorrect.
The Sanchez court stated with regard to background information that "experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc. This latitude is a *1138 matter of practicality. A physician is not required to personally replicate all medical experiments dating back to the time of Galen in order to relate generally accepted medical knowledge that will assist the jury in deciding the case at hand. An expert's testimony as to information generally accepted in the expert's area, or supported by his own experience, may usually be admitted to provide specialized context the jury will need to resolve an issue. When giving such testimony, the expert often relates relevant principles or generalized information rather than reciting specific statements made by others." ( Sanchez , supra , 63 Cal.4th at p. 675, 204 Cal.Rptr.3d 102, 374 P.3d 320.) Accordingly, Sanchez "does not call into question the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field. ... Thus, our decision does not affect the traditional latitude granted to experts to describe background information and knowledge in the area of his expertise." ( Id . at p. 685, 204 Cal.Rptr.3d 102, 374 P.3d 320.)
In distinguishing between case-specific facts, which an expert may not relay, and background information as to which she may, the court gave as an example of the latter testimony that a "diamond is a symbol adopted by a given street gang." ( Sanchez , supra , 63 Cal.4th at p. at p. 677, 204 Cal.Rptr.3d 102, 374 P.3d 320.) The court indicated it could be established that a person has a diamond tattoo through testimony of a witness who saw the tattoo or an authenticated photograph, and the expert could opine that the presence of a diamond tattoo shows the person belongs to the gang. ( Ibid. ) The Sanchez court also stated that the expert in the case before it could testify "based on well-recognized sources in [the expert's] area of expertise" "about general gang behavior or ... the Delhi gang's conduct and its territory," which was "relevant and admissible evidence as to the Delhi gang's history and general operations." ( Id . at p. 698, 204 Cal.Rptr.3d 102, 374 P.3d 320.) Since Sanchez , California appellate courts have held that expert testimony about "the general attributes of the ... gang, such as the gang's culture, the importance placed on reputation and guns, ... the gang's rivals and claimed turf, the use of monikers and identifying symbols, and the like, [are] permissible as expert background testimony." ( People v. Iraheta (2017) 14 Cal.App.5th 1228, 1247, 222 Cal.Rptr.3d 706 ; People v. Meraz (2017) 6 Cal.App.5th 1162, 1175, 212 Cal.Rptr.3d 81 [expert may provide general background testimony about gang's operations, primary activities and pattern of criminal activities].)
Here, given the nature of Cunnie's expertise, his training and experience were developed in the streets and in the police stations of North Oakland. Under Sanchez , he was not required to personally replicate all investigations dating back to the inception of the NSO-Berkeley gang rivalry in 2002 in order to relate general information about those two gangs and their rivalry. Under Sanchez , Cunnie's description of the two gangs' activities and their rivalry was admissible even though it was to a large extent derived from conversations with others or the review of police reports. Further, although *1139 not required, the fact of the rivalry is corroborated by other admissible evidence, such as Anthony's April 23 statements to Oakland police and testimony *530 by Sergeant Emily Murphy of the Berkeley Police Department. Murphy indicated a joint task force was formed in the spring of 2009 "to address the violence that was going on between ... groups ... in South Berkeley and West Berkeley and in North Oakland."
Second, defendants contend that Cunnie testified about certain facts based on other inadmissible hearsay, including testimonial hearsay, such as his "discussion of tattoos, writings and media pages." Although vaguely stated, this appears to be an attack on Cunnie's extensive testimony about photographs of defendants' tattoos and gang signs. This argument fails because Cunnie did not rely on hearsay to testify that defendants had the tattoos or made the hand signs in question. Rather, he relied on other evidence that defendants do not contend was inadmissible. As we have already indicated, Cunnie testified about a number of photographs for each defendant that the prosecution proffered elsewhere during trial, and the court admitted all of the photographs shown to Cunnie that we have discussed. Specifically, as we have discussed, after Cunnie testified, the court held a hearing outside the presence of the jury in which it admitted these exhibits without defendants making any objections relevant to the issues before us. Defendants do not challenge the court's admission of any of these photographs on appeal. Cunnie's testimony about the significance of these tattoos and gang signs was similar to that identified as admissible background information in Sanchez ; he testified that particular tattoos and hand signs were used to convey allegiance to the NSO gang and its subsets.
Third, defendants Flowers, Price and Campbell complain about Cunnie's testimony regarding Anthony's statements to Oakland police on April 23, 2009, as inadmissible testimonial hearsay. As we have already discussed, the court did not err in admitting Anthony's statements during trial, and instructed the jury that it was to consider these statements as to Anthony only. Cunnie testified about the import of these statements, but did not assert that his observations applied to Flowers, Price or Campbell. In other words, he merely testified about evidence that was properly admitted independent of his testimony, and nothing more. (See Sanchez , supra , 63 Cal.4th at p. 684, 204 Cal.Rptr.3d 102, 374 P.3d 320.)
Fourth, Flowers contends Cunnie testified about the primary activities of NSO based on police reports, apparently contending these reports were inadmissible case-specific hearsay. We must presume all intendments and presumptions in favor of the judgment, and " ' "on matters to which the record is silent, error must be affirmatively shown." ' " ( People v. Giordano (2007) 42 Cal.4th 644, 666, 68 Cal.Rptr.3d 51, 170 P.3d 623, quoting *1140 Denham v. Superior Court of Los Angeles (1970) 2 Cal.3d 557, 564, 86 Cal.Rptr. 65, 468 P.2d 193.) This particular argument fails because the record is silent on the source of Cunnie's information, since none of the defendants specifically objected to this portion of Cunnie's testimony. Cunnie was not asked about his sources, and Flowers does not offer any citation to the record that establishes that Cunnie relied on police reports. Therefore, error has not been affirmatively shown.[36] *531 Fifth, Anthony similarly argues that Cunnie improperly relied on a 56-page "Gang Predicate Report" that he prepared to refresh his recollection during his testimony about police contacts and crimes involving Anthony and other gang members in 2007 and 2008. Cunnie could review this document to refresh his recollection so long as he did not testify about its contents. He did not testify about its contents; nor was it admitted. Sanchez is concerned with an expert's testimony about case-specific hearsay, not an expert's reliance on such information.
b. The Error Defendants Identify Is Harmless.
Defendants challenge various other aspects of Cunnie's testimony that come closer to, or undeniably were, based on case-specific and in some instances testimonial hearsay. This includes Cunnie's testimony of his understanding that defendants had certain contacts with legal authorities and committed certain criminal acts not shown by admissible evidence that *1141 indicated an affiliation with NSO[37] ; that Ngo was an NSO member who helped start ASAP, that certain other individuals were NSO members and committed NSO-related crimes, and that certain NSO members were killed in incidents that were a part of the NSO-Berkeley gang rivalry; that there had been a shooting attack on Charles and others earlier in May at a liquor store in the Berkeley Waterfront gang's territory and a shooting incident involving an NSO member in the early morning hours of May 8, 2009, in Oakland; and that Jermaine and other people Anthony identified in his May 18 statements to Oakland police were Berkeley gang members. Many of defendants' Sanchez and Crawford arguments to Cunnie's *532 testimony about these matters have merit, at a minimum because this challenged testimony was not based on admissible evidence or personal experience and, therefore, was case-specific hearsay. Cunnie testified before Sanchez and, accordingly, was permitted to testify about this case-specific hearsay to explain the basis for some of his opinions under People v. Gardeley . In some instances, the hearsay was testimonial and its admission violated Crawford .
However, we will not address defendants' contentions on the merits because, assuming it was error to admit all of this testimony, these errors were harmless beyond a reasonable doubt. The admissible evidence we have already discussed, both that to which Cunnie properly testified and that which was admitted elsewhere during trial through other witnesses and exhibits, overwhelmingly proved defendants' guilt of the offenses with which they were charged and the related enhancements. True, the inadmissible hearsay and testimonial hearsay evidence about which Cunnie testified made the case against defendants even stronger. But even without it the jury was presented with a compelling case that defendants together committed the NSO gang-related first degree murder of Charles and second degree murders of Perea and Ross.
For example, phone records show constant communications among three of the four defendants in the weeks and days leading up to the murders.[38] Three *1142 weeks after the murder of Ngo, an NSO gang member,[39] and the attempted murders of Anthony and Bao during the same incident by individuals Anthony suspected were Berkeley gang members, the four defendants drove together with two assault rifles and a handgun into the heart of the Berkeley gang's territory. Flowers brutally executed Charles, who was the brother of a reputed Berkeley gang member (as indicated by the testimony of Charles's sister and Oakland Police Sergeant Fleming), as the other defendants visibly demonstrated their support. Flowers's intent to murder Charles was obvious from his firing at least 17 shots at Charles. Any idea that Flowers acted alone or intended only to assault Charles is belied by this murderous barrage coupled with the celebratory acts of Anthony, Price and Campbell. The four then fled together in Anthony's Cadillac as Anthony drove recklessly, attempting to evade the police at high speeds, leading to the collisions and deaths of the two other victims. In light of these facts, all of which were amply proved by admissible evidence, any error was harmless beyond a reasonable doubt under Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705.[40] *533 VIII.-IX.†
X.
The Court's Instructional Error Under Chiu Was Harmless.
Defendants Anthony, Price and Campbell argue the trial court erred under California Supreme Court case law when it instructed the jury that it could convict them of first degree murder as aiders and abettors to an assault on Charles, the natural and probable consequence of which was first degree murder. This was one of the prosecution's two theories of liability for count one. In People v. Chiu (2014) 59 Cal.4th 155, 172 Cal.Rptr.3d 438, 325 P.3d 972 ( Chiu ), which was decided after the trial of this case, our Supreme Court *1143 rejected the then-existing statutory and doctrinal bases of the natural and probable consequences doctrine.[43] The three defendants contend we must reverse their first degree murder convictions, as well as the jury's related special circumstance findings, because the jury may have relied on this prohibited theory to convict them. The People agree the trial court's instruction was error under Chiu , but argue it was harmless because the record indicates the jury convicted the three based on the prosecution's other theory of liability: that they were direct aiders and abettors or conspirators in first degree murder. We agree with the People.
A. The Relevant Proceedings Below
In his closing argument, the prosecutor asserted that Flowers was the man who shot Charles. He further argued regarding Anthony, Price and Campbell, "the evidence is clearly that they aided and abetted a first degree murder and that they conspired to commit a first degree murder." He also argued that if the jury did not find the three intended to commit first degree murder, it should nonetheless find they aided and abetted in, or conspired to commit, a firearm assault on Charles, the natural and probable consequence of which was Flowers's first degree murder of Charles.
The court instructed the jury regarding both of these theories, including with the use of the court's modification of CALCRIM No. 403. The jury convicted Anthony, Price and Campbell of the first degree murder of Charles. The verdict forms do not indicate on what theory of liability the jury relied.
B. Analysis
1. The Trial Court Committed Chiu Error .
After the trial, the California Supreme Court held that "a defendant cannot be convicted of first degree premeditated murder under the natural and probable consequences doctrine ...." ( Chiu , supra , 59 Cal.4th at p. 167, 172 Cal.Rptr.3d 438, 325 P.3d 972.) The court concluded that, given the vicarious nature of liability under the natural and probable consequences doctrine ( id . at p. 164, 172 Cal.Rptr.3d 438, 325 P.3d 972 ), "the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved ...." ( *534 Id . at p. 166, 172 Cal.Rptr.3d 438, 325 P.3d 972.) Subsequently, an appellate *1144 court, relying on Chiu 's reasoning, held that an uncharged conspiracy cannot be the basis for first degree murder liability under the natural and probable consequences doctrine. ( People v. Rivera (2015) 234 Cal.App.4th 1350, 1356, 184 Cal.Rptr.3d 801.) Based on this case law, we conclude the trial court erred by instructing that an aider and abettor or conspirator who did not intend to kill could be convicted of first degree murder under the natural and probable consequences doctrine.[44]
2. The Trial Court's Instructional Error Was Harmless .
The court's error was harmless beyond a reasonable doubt. The record indicates the jury found Anthony, Price and Campbell guilty of first degree murder based on a legally correct theory.
"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground ." ( Chiu , supra , 59 Cal.4th at p. 167, 172 Cal.Rptr.3d 438, 325 P.3d 972, italics added.) Thus, we affirm a first degree murder verdict when the record demonstrates "beyond a reasonable doubt that the jury based its verdict on the legally valid theory." ( Ibid . )
The jury was presented with the legally correct theory that Anthony, Price and Campbell directly aided and abetted or conspired in Flowers's first degree murder of Charles. "Aiders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles. [Citation.] Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." ( Chiu , supra , 59 Cal.4th at pp. 166-167, 172 Cal.Rptr.3d 438, 325 P.3d 972.) As for conspirators, one who conspires to commit a murder is guilty of first degree murder when a co-conspirator commits the murder. ( People v. Cortez (1998) 18 Cal.4th 1223, 1237, 77 Cal.Rptr.2d 733, 960 P.2d 537 ["all conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder"].)
The jury's verdicts indicate beyond a reasonable doubt that the jury relied on this legally correct theory. First, for each of these three defendants, the jury found true the special circumstance allegation that he committed multiple murders. The jury was instructed under CALCRIM No. 702 to consider this special circumstance, as well as the special circumstance of murder while an *1145 active participant in a criminal street gang, if it found defendant was an aider and abettor or conspirator in the first degree murder, and not the actual killer. The People had to show beyond a reasonable doubt that such a defendant "acted with the intent to kill" for the jury to find these special circumstances true.[45] *535 The jury's findings that Anthony, Price and Campbell, none of whom was proven to be the actual killer, intended to kill Charles strongly suggests that its first degree murder verdicts for each of them were based on its conclusion that each aided and abetted or conspired to murder Charles, not merely to assault him.
Anthony, Price and Campbell argue these jury findings do not necessarily mean the jury found they committed first degree murder. They contend the jury's findings that they each acted with an intent to kill establish only an intent to commit second degree murder and, further, that the jury could have found the natural and foreseeable consequence of an intent to commit this more limited crime was the first degree murder of Charles. We disagree for three reasons.
First, as we have already discussed, murder conspirators are necessarily guilty of first degree murder. ( People v. Cortez , supra , 18 Cal.4th at pp. 1237-1238, 77 Cal.Rptr.2d 733, 960 P.2d 537.)
Second, while a person may aid and abet in a second degree murder, the jury was not presented with circumstances that could reasonably support such a conclusion for the three defendants. Every aspect of their conduct indicates they acted with willfulness, deliberation and premeditation to murder Charles, as we have already described. These circumstances indicate they were intent upon murder when they drove together into Berkeley, and were intent upon murdering Charles specifically when they came upon him because of his familial relationship to reputed Berkeley gang member Jermaine. Their actions show planning, motive and a preexisting intent to kill, rather than unconsidered, impulsive actions. Accordingly, the prosecutor emphasized a first degree murder theory in his closing argument to the jury, such as when he asserted, "This was an ambush and an execution. Plain and simple."[46]
Third, the jury's finding that Flowers acted with the intent to kill and its verdict that his killing of Charles was murder in the first degree are powerful *1146 indications that its "intent to kill" findings regarding Anthony, Price and Campbell were based on its conclusion that they joined with him to commit first degree murder. On this record, it would have been nonsensical for the jury to conclude that, while Flowers acted with premeditation and deliberation in committing the murder, he was aided and abetted, or in a conspiracy, with three defendants who did not form the intent to kill until the murder occurred. The jury would have had to conclude that Flowers concealed his own murderous intent from Anthony, Price and Campbell as they drove into the heart of the Berkeley gang's territory until the moment Flowers killed Charles, and that each of the three decided on the spur of the moment to aid and abet, or conspire, with Flowers to murder Charles. This despite Flowers's near constant cell phone communications with both Anthony and Price in the days leading up to the murder, and defendants' travel together to the rival Berkeley gang's territory heavily armed and with masks. There is no evidence to support this theory, and the circumstances we have already described make it highly implausible. (See People v. Guiton (1993) 4 Cal.4th 1116, 1127, 17 Cal.Rptr.2d 365, 847 P.2d 45 [in evaluating *536 whether a jury verdict was supported by substantial evidence when the jury was presented with both a supported and unsupported factual theory, "[a]n appellate court necessarily operates on the assumption that the jury has acted reasonably, unless the record indicates otherwise"].) Defendants' argument that the jury's "intent to kill" finding was consistent with second degree murder ignores the overwhelming evidence.
Finally, Campbell argues that it cannot be determined from the jury's special circumstance findings whether the jury improperly relied on the natural and probable consequence of assault theory because, although the special circumstance instructions include that the jury must find an "intent to kill," they also state that "[t]he People do not have to prove that the actual killer acted with the intent to kill in order for this special circumstance to be true." Further, although the jurors were instructed only to consider the special circumstance allegations if they had already found the defendant guilty of first degree murder, they could have done so under the improper natural and probable consequence of assault theory. These arguments lack merit in light of the jury's special circumstance findings that each defendant, including Flowers, who the evidence plainly indicated was the shooter, did act with the intent to kill . This finding shows that the jury concluded that in firing a barrage of bullets at Charles, Flowers acted to murder him and not merely to assault him.
In short, we conclude the court's instructional error under Chiu was harmless beyond a reasonable doubt.
*1147 XI.
Defendants Cannot Raise Their Senate Bill 1437 Claim in This Appeal.
Defendants next argue we must reverse both their first and second murder convictions because of recent statutory changes to the application of the natural and probable consequences doctrine (as well as the felony murder rule) to first and second degree murder that extend beyond our Supreme Court's holding in Chiu , supra , 59 Cal.4th 155, 172 Cal.Rptr.3d 438, 325 P.3d 972.[47] These changes, which the Legislature adopted in 2018 in Senate Bill 1437 and which went into effect on January 1, 2019, ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life. (Stats. 2018, ch. 1015, § 4; § 1170.95, subd. (a)(3).) Defendants contend that, since Senate Bill 1437 went into effect while their appeals were pending, they are entitled to reversal of their convictions in this appeal based on the retroactive application of these changes under In re Estrada (1965) 63 Cal.2d 740, 48 Cal.Rptr. 172, 408 P.2d 948 ( Estrada ).
The People do not disagree that Senate Bill 1437 applies retroactively to defendants' cases. However, they point out that Senate Bill 1437 also establishes a specific procedure, outlined in section 1170.95, by which those who have been convicted of *537 murder based on a natural and probable consequences theory of liability or felony murder rule may petition the sentencing court to consider the evidence, including new and additional evidence beyond that contained in the record of conviction, and, if appropriate, vacate a murder conviction under the new law. The People contend defendants can only seek Senate Bill 1437 relief through this petition procedure, and cannot seek relief in this direct appeal. We agree with the People.
As an appellate court explained in discussing a similar petition procedure for retroactive relief based on changes in sentencing contained in Proposition 47, "[t]here are no constitutional rights involved here: The right to appeal and the right to pursue recall and resentencing are both statutory." ( People v. Scarbrough (2015) 240 Cal.App.4th 916, 924-930, 193 Cal.Rptr.3d 125 *1148 ( Scarbrough ) [trial court had no jurisdiction to hear a Proposition 47 petition while appeal was pending].) Our role, then, is to determine the intent of the Legislature in enacting Senate Bill 1437. (See People v. Lara (2018) 4 Cal.5th 299, 307, 228 Cal.Rptr.3d 394, 410 P.3d 22 ( Lara ) ["In order to determine if a law is meant to apply retroactively, the role of a court is to determine the intent of the Legislature"].)
A recently published Second Appellate District opinion, People v. Martinez (2019) 31 Cal.App.5th 719, 242 Cal.Rptr.3d 860 ( Martinez ), addresses whether a convicted defendant whose case was pending on appeal on January 1, 2019, could seek vacatur of his murder conviction under Senate Bill 1437 in his appeal or was required to file a petition in the sentencing court instead. We quote extensively from Martinez in discussing defendants' Senate Bill 1437 claims.
As for the Legislature's specific statutory changes, "Senate Bill 1437 was enacted to 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).) Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability. Senate Bill 1437 also adds ... section 1170.95, which allows those 'convicted of felony murder or murder under a natural and probable consequences theory ... [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts ....' ( § 1170.95, subd. (a).)
"An offender may file a petition under section 1170.95 where all three of the following conditions are met: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019.' ( § 1170.95, subd. (a)(1)-(3).)
"Pursuant to section 1170.95, subdivision (c), the petition shall include, among other things, a declaration by the petitioner stating he or she is eligible for relief based on all three aforementioned requirements of *538 subdivision (a). *1149 A trial court that receives a petition under section 1170.95 'shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section.' ( § 1170.95, subd. (c).) If the petitioner has made such a showing, the trial court 'shall issue an order to show cause.' ( § 1170.95, subd. (c).)
"The trial court must then hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not ... previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' ( § 1170.95, subd. (d)(1).) 'The parties may waive a resentencing hearing and stipulate that the petitioner is eligible to have his or her murder conviction vacated and for resentencing. If there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner.' ( § 1170.95, subd. (d)(2).) Significantly, if a hearing is held, '[t]he prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' ( § 1170.95, subd. (d)(3).) '[T]he burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' ( § 1170.95, subd. (d)(3).) 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.' ( § 1170.95, subd. (d)(3).)
" Section 1170.95, subdivision (f) states: 'This section does not diminish or abrogate any rights or remedies otherwise available to the petitioner.' " ( Martinez , supra , 31 Cal.App.5th at pp. 723-724, 242 Cal.Rptr.3d 860.)
In Martinez , the defendant was convicted of first degree murder. ( Martinez , supra , 31 Cal.App.5th at p. 722, 242 Cal.Rptr.3d 860.) On appeal, he contended that the court should afford him the ameliorative benefits of the recently enacted Senate Bill 1437. The People argued the defendant was required to seek this relief by filing a petition as allowed under section 1170.95 and could not circumvent that process by seeking retroactive relief in his appeal. ( Martinez , supra , 31 Cal.App.5th at p. 724, 242 Cal.Rptr.3d 860.)
The appellate court agreed with the People in an extensive analysis: "Our Supreme Court recently summarized the principles articulated in Estrada , supra , 63 Cal.2d 740, 48 Cal.Rptr. 172, 408 P.2d 948 : ' "[A]n amendatory statute lessening punishment is presumed to apply in all cases not yet reduced to final judgment as of the amendatory statute's effective date" ( People v. Floyd (2003) 31 Cal.4th 179, 184 [1 Cal.Rptr.3d 885, 72 P.3d 820], citing Estrada , at p. 744 [48 Cal.Rptr. 172, 408 P.2d 948] ), unless the *1150 enacting body "clearly signals its intent to make the amendment prospective, by the inclusion of either an express saving clause or its equivalent" ( People v. Nasalga (1996) 12 Cal.4th 784, 793 [50 Cal.Rptr.2d 88, 910 P.2d 1380] ; see Estrada , at p. 747 [48 Cal.Rptr. 172, 408 P.2d 948] ). This rule rests on an inference that when the Legislature has reduced the punishment for an offense, it has determined the "former penalty was too severe" ( Estrada , at p. 745 [48 Cal.Rptr. 172, 408 P.2d 948] ) and therefore "must have intended that the new statute imposing the new lighter penalty ... should apply to every case to which it constitutionally could apply" ( ibid . ).' ( *539 People v. DeHoyos (2018) 4 Cal.5th 594, 600, 229 Cal.Rptr.3d 687, 412 P.3d 368 ( DeHoyos ).)
"Two recent California Supreme Court opinions in circumstances analogous to those here point the way to the proper resolution of whether Senate Bill 1437 should be given retroactive effect on direct appeal notwithstanding the bill's enactment of the section 1170.95 petitioning procedure.
"In People v. Conley (2016) 63 Cal.4th 646 [203 Cal.Rptr.3d 622, 373 P.3d 435] ( Conley ), our Supreme Court considered whether Estrada 's holding compelled a conclusion that the Three Strikes Reform Act of 2012, commonly known as Proposition 36, applied retroactively to defendants whose judgments were not yet final. ( Conley , at pp. 655-656 [203 Cal.Rptr.3d 622, 373 P.3d 435].) The defendant in Conley had been sentenced to an indeterminate term of 25 years to life under the 'Three Strikes' law. Voters passed Proposition 36 while his appeal was pending ( Conley , at pp. 654-655 [203 Cal.Rptr.3d 622, 373 P.3d 435] ), and the initiative reduced the penalty for some third strike offenders whose third strike was not a serious or violent felony ( id . at p. 652 [203 Cal.Rptr.3d 622, 373 P.3d 435] ). Proposition 36 also created a postconviction procedure that allowed prisoners who were already serving indeterminate life terms to seek resentencing for offenses that, if committed after the act's effective date, would no longer support life terms. (§ 1170.126, subd. (b).)
"The defendant in Conley argued he was entitled to rely on Estrada 's retroactivity rule, which would enable him to seek Proposition 36 relief without complying with the initiative's petition procedure. ( Conley , supra , 63 Cal.4th at pp. 654-655 [203 Cal.Rptr.3d 622, 373 P.3d 435].) That procedure, among other things, gives trial judges discretion to withhold Proposition 36 relief if a judge finds that resentencing the petitioner would pose an unreasonable risk of danger to public safety. ( Conley , at pp. 654-655 [203 Cal.Rptr.3d 622, 373 P.3d 435] ; § 1170.126, subd. (f).)
"Our Supreme Court rejected defendant Conley's argument and held the postconviction procedure provided by section 1170.126 was the exclusive means by which those who had been sentenced before Proposition 36's effective date could seek relief under the new law. ( Conley , supra , 63 Cal.4th at pp. 661-662 [203 Cal.Rptr.3d 622, 373 P.3d 435].) The court acknowledged the continuing vitality of the Estrada rule in the unremarkable case of an ameliorative statute silent on *1151 whether it applies retroactively, but the Supreme Court concluded Conley was not entitled, on direct appeal, to invoke Proposition 36's changes to prior law for three principal reasons.
"First, Proposition 36 was 'not silent on the question of retroactivity' but instead 'expressly addresse[d] the question in section 1170.126, the sole purpose of which is to extend the benefits of [Proposition 36] retroactively.' ( Conley , supra , 63 Cal.4th at p. 657 [203 Cal.Rptr.3d 622, 373 P.3d 435].) In doing so, Proposition 36 did not distinguish between persons serving final sentences and those serving nonfinal sentences. ( Conley , at p. 657 [203 Cal.Rptr.3d 622, 373 P.3d 435].)
"Second, Proposition 36 made resentencing contingent on a court's evaluation of a defendant's dangerousness. Conferring an automatic entitlement to resentencing on defendants whose cases were still pending on direct appeal would not allow courts to conduct that inquiry, and the court found no basis to hold the electorate intended 'for courts to bypass the public safety inquiry altogether in the case of defendants serving sentences that are not yet final.' ( Conley , supra , 63 Cal.4th at pp. 658-659 [203 Cal.Rptr.3d 622, 373 P.3d 435].)
*540 "Third, the changes in law worked by Proposition 36 not only reduced previously prescribed criminal penalties but also established 'a new set of disqualifying factors that preclude a third strike defendant from receiving a second strike sentence,' factors that the prosecution was required to plead and prove. ( Conley , supra , 63 Cal.4th at p. 659 [203 Cal.Rptr.3d 622, 373 P.3d 435].) Because Proposition 36 did not address the complexities involved in applying the pleading-and-proof requirements to previously sentenced defendants, the court concluded the electorate did not contemplate those provisions would apply to previously sentenced defendants. ( Conley , at pp. 660-661 [203 Cal.Rptr.3d 622, 373 P.3d 435].) Rather, they intended such defendants to seek relief under section 1170.126, which did not contain pleading-and-proof requirements.
"Our Supreme Court reached a similar result in DeHoyos , supra , 4 Cal.5th 594 [229 Cal.Rptr.3d 687, 412 P.3d 368], which presented the question of whether Proposition 47 ('the Safe Neighborhoods and Schools Act') applied retroactively to nonfinal cases on direct appeal. 'Proposition 47 redefined several common theft- and drug-related felonies as either misdemeanors or felonies' and enacted a petitioning procedure similar to that enacted as part of Proposition 36. ( DeHoyos , at p. 597 [229 Cal.Rptr.3d 687, 412 P.3d 368].) The DeHoyos court noted Proposition 47, like Proposition 36, was 'an ameliorative criminal law measure that is "not silent on the question of retroactivity," but instead contain[ed] a detailed set of provisions designed to extend the statute's benefits retroactively.' ( DeHoyos , at p. 603 [229 Cal.Rptr.3d 687, 412 P.3d 368].) Those provisions included a recall of sentence petitioning mechanism for individuals 'serving a sentence' for a covered offense as of Proposition 47's effective date. (§ 1170.18, subd. (a).)
*1152 "As it did in Conley when analyzing Proposition 36, the DeHoyos court found it significant that Proposition 47's recall of sentence petitioning mechanism drew 'no express distinction between persons serving final sentences and those serving nonfinal sentences, instead entitling both categories of prisoners to petition courts for recall of sentence' and 'expressly ma[king] resentencing dependent on a court's assessment of the likelihood that a defendant's early release will pose a risk to public safety, undermining the idea that voters "categorically determined that 'imposition of a lesser punishment' will in all cases 'sufficiently serve the public interest.' " ( Conley , [supra , 63 Cal.4th] at p. 658 [203 Cal.Rptr.3d 622, 373 P.3d 435] ; see § 1170.18, subd. (b).)' ( DeHoyos , supra , 4 Cal.5th at p. 603 [229 Cal.Rptr.3d 687, 412 P.3d 368].) The DeHoyos court acknowledged Proposition 47 differed from Proposition 36 in that it did not 'create new sentencing factors that the prosecution must "plead[ ] and prove[ ]" (§ 1170.12, subd. (c)(2)(C) ) to preclude a grant of leniency.' ( DeHoyos , at p. 603 [229 Cal.Rptr.3d 687, 412 P.3d 368].) The court explained, however, that other indicia of legislative intent, including Proposition 47's broad statement of purpose, revealed the initiative's petitioning procedure was meant to be the exclusive avenue for retroactive relief for all previously sentenced defendants, whether or not their sentences were final. ( DeHoyos , at p. 603 [229 Cal.Rptr.3d 687, 412 P.3d 368].)
"The analytical framework animating the decisions in Conley and DeHoyos is equally applicable here. Like Propositions 36 and 47, Senate Bill 1437 is not silent on the question of retroactivity. Rather, it provides retroactivity rules in section 1170.95. The petitioning procedure specified in that section applies to persons who have been convicted of felony murder or *541 murder under a natural and probable consequences theory. It creates a special mechanism that allows those persons to file a petition in the sentencing court seeking vacatur of their conviction and resentencing. In doing so, section 1170.95 does not distinguish between persons whose sentences are final and those whose sentences are not. That the Legislature specifically created this mechanism, which facially applies to both final and nonfinal convictions, is a significant indication Senate Bill 1437 should not be applied retroactively to nonfinal convictions on direct appeal.
"The remainder of the procedure outlined in section 1170.95 underscores the legislative intent to require those who seek retroactive relief to proceed by way of that statutorily specified procedure. The statute requires a petitioner to submit a declaration stating he or she is eligible for relief based on the criteria in section 1170.95, subdivision (a). ( § 1170.95, subd. (b)(1)(A).) Where the prosecution does not stipulate to vacating the conviction and resentencing the petitioner, it has the opportunity to present new and additional evidence to demonstrate the petitioner is not entitled to resentencing. ( § 1170.95, subd. (d)(3).) The petitioner, too, has the opportunity to present new or additional evidence on his or her behalf. ( § 1170.95, subd. (d)(3).) Providing the parties with the opportunity to go beyond the original record in *1153 the petition process, a step unavailable on direct appeal, is strong evidence the Legislature intended for persons seeking the ameliorative benefits of Senate Bill 1437 to proceed via the petitioning procedure. The provision permitting submission of additional evidence also means Senate Bill 1437 does not categorically provide a lesser punishment must apply in all cases, and it also means defendants convicted under the old law are not necessarily entitled to new trials. This, too, indicates the Legislature intended convicted persons to proceed via section 1170.95 's resentencing process rather than avail themselves of Senate Bill 1437's ameliorative benefits on direct appeal." ( Martinez , supra , 31 Cal.App.5th at pp. 724-728, 242 Cal.Rptr.3d 860.)
We agree with this analysis by the Martinez court, and adopt it. In doing so, we reject defendants' arguments that they are entitled to the consideration of the merits of their Senate Bill 1437 claims in this appeal.
Defendants contend for several reasons that the Legislature did not intend the petition procedure enacted by Senate Bill 1437 would be the exclusive remedy for defendants such as themselves. First, defendants contend Senate Bill 1437's statutory changes are materially different from those discussed in Conley and DeHoyos . Defendants emphasize that each of those cases held that the Legislature intended the petition procedure at issue to be the exclusive remedy for retroactive relief in large part because the proposition (Proposition 36 in Conley and Proposition 47 in DeHoyos ) did not afford retroactive relief automatically; rather, it authorized the sentencing court to determine in its discretion whether a petitioner posed an unreasonable risk of danger to public safety before granting any retroactive sentencing relief. They note that Senate Bill 1437 does not provide such discretionary authority to sentencing courts and contend this difference is determinative. As Flowers puts it, in the absence of such a "risk of danger" assessment, Senate Bill 1437 "does not depend upon a yet-to-be determined question of fact" and, therefore, defendants' retroactive claims based on Senate Bill 1437 should be considered on direct appeal.
We disagree. Although Senate Bill 1437 does not contain a "risk of danger" provision, *542 it does not provide automatic retroactive relief to convicted defendants any more than do Proposition 36 and Proposition 47. Rather, as the Martinez court explained, it creates a petition procedure in which the People are afforded an opportunity to present new and additional evidence to demonstrate the petitioner is not entitled to resentencing, and the petitioner is afforded the opportunity to present new and additional evidence on his or her behalf as well, before the court determines the appropriate relief. ( § 1170.95, subd. (d)(3).) These opportunities, unavailable on direct appeal, indicate the Legislature intended those seeking the ameliorative retroactive benefits of Senate Bill 1437 proceed by way of this petitioning *1154 procedure. As the Martinez court stated in response to the same argument that defendants make here, "neither Conley nor DeHoyos holds that inquiry [into risk of danger] was the indispensable statutory feature on which the result in those cases turned. To the contrary, Conley notes '[o]ur cases do not "dictate to legislative drafters the forms in which laws must be written" to express an intent to modify or limit the retroactive effect of an ameliorative change; rather, they require "that the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it." ' ( Conley , supra , 63 Cal.4th at pp. 656-657, 203 Cal.Rptr.3d 622, 373 P.3d 435 ; see also Lara , supra , 4 Cal.5th at p. 312, 228 Cal.Rptr.3d 394, 410 P.3d 22 [explaining Conley held Estrada 's inference of retroactivity was inapplicable because 'the legislation contained its own retroactivity provision '].) Accordingly, we look not for specific procedural conditions, but for indicia of the Legislature's intent." ( Martinez , supra , 31 Cal.App.5th at p. 728, 242 Cal.Rptr.3d 860.) Employing this approach in addressing section 1170.95, the Martinez court observed that "the other indications the Legislature intended to restrict individuals who have already been convicted to the petitioning procedure outlined in section 1170.95 are considerable." ( Ibid . ) We agree.
Second, defendants argue Senate Bill 1437, as reflected in its language and the Senate's supporting declarations about its purpose, provides substantively different and greater retroactive relief than Proposition 36 and Proposition 47 because it changes the law regarding a person's liability for murder, rather than merely providing the opportunity for a reduced sentence, and, therefore, they have the right to seek retroactive relief as a part of their overall right to challenge their convictions on appeal. They also contend they are not seeking the same relief as that which may be obtained via the petition procedure, i.e., vacatur and resentencing, but instead are simply seeking the standard appellate remedy of reversal of their convictions and remand for a new jury trial. They reason that by our granting them reversal and a new jury trial, the People will have the same opportunity afforded to them by the petition procedure to present new and additional evidence in support of the murder charges against defendants. Therefore, the People are not deprived of any of the rights afforded to them under Senate Bill 1437. None of these arguments are persuasive because they ignore that the Legislature prescribed a specific avenue for convicted defendants to seek retroactive relief, the petition procedure outlined in section 1170.95. As the Conley court explained regarding Proposition 36, the Legislature "took the extraordinary step of extending the retroactive benefits of the Act beyond the bounds contemplated by Estrada -including even prisoners serving final sentences without the Act's ameliorative reach-but subject to a special procedural mechanism for the recall of sentences already imposed." ( *543 Conley , supra , 63 Cal.4th at pp. 657-658, 203 Cal.Rptr.3d 622, 373 P.3d 435.) *1155 Defendants refer to numerous cases in contending that they are entitled to the retroactive relief provided by Senate Bill 1437 on direct appeal.[48] We have reviewed all the cases defendants cite. None involves or grapples with the legislative enactment of a specific procedure for the consideration of retroactive relief of a change in the law. They are thus inapposite. (See Martinez , supra , 31 Cal.App.5th at pp. 728-729, 242 Cal.Rptr.3d 860 [finding cases cited by the defendant to be inapposite because none of them "involved a new or amended law that 'modif[ied], limit[ed], or entirely forb[ade] the retroactive application of ameliorative criminal law amendments' "].) The cases that do grapple with such an enactment are Conley and DeHoyos , and they support the Martinez case's holding that retroactive relief must be sought under the statutory procedure.
Defendants further contend that to restrict their avenue for relief to the petition procedure would place them in the untenable position of having to wait for the resolution of their appeal before they can bring a petition, because the sentencing court does not have concurrent jurisdiction with the appellate court. (See Scarbrough , supra , 240 Cal.App.4th at pp. 924-930, 193 Cal.Rptr.3d 125 [trial court had no jurisdiction to hear a Proposition 47 petition while appeal was pending].) Defendants contend that to construe Senate Bill 1437's petition procedure as their exclusive avenue for relief leaves them without an effective remedy, an absurd consequence that we must presume the Legislature did not intend. (See In re Greg F. (2012) 55 Cal.4th 393, 406, 146 Cal.Rptr.3d 272, 283 P.3d 1160.) Further, it is contended that such a construction would frustrate judicial economy and that, to the extent Senate Bill 1437 is ambiguous, we must construe it in favor of defendants (see People v. Davis (1981) 29 Cal.3d 814, 828, 176 Cal.Rptr. 521, 633 P.2d 186 ; Estate of Stoker (2011) 193 Cal.App.4th 236, 242, 122 Cal.Rptr.3d 529 ).
*1156 We reject these arguments. There is nothing in the petition procedure enacted by Senate Bill 1437, which is outlined in section 1170.95, that indicates the Legislature intended that convicted defendants were entitled to immediate retroactive relief. (See Scarbrough , supra , 240 Cal.App.4th at p. 928, 193 Cal.Rptr.3d 125 [concluding nothing in Proposition 47 contemplates immediate retroactive relief in rejecting a similar argument].) Also, the Scarbrough court concluded regarding Proposition 47, " '[i]t is reasonable for the *544 voters to have designed a statutory process where the trial court considers a petition for a recall of sentence after final resolution of legal issues related to the conviction and original sentence (which may have components that are unaffected by [the Three Strikes Reform Act of 2012] ).' " ( Scarbrough , at p. 925, 193 Cal.Rptr.3d 125, quoting People v. Yearwood (2013) 213 Cal.App.4th 161, 177, 151 Cal.Rptr.3d 901 [regarding section 1170.126].) The same is true here. The Scarbrough court also deemed Proposition 47 voters to have been aware of this previous interpretation in Yearwood when they approved Proposition 47, further evidence of their intentions to design a petition process that was only available after the resolution of a pending appeal. ( Scarbrough , at p. 925, 193 Cal.Rptr.3d 125.) This can be equally said about the Legislature's awareness of Scarbrough and Yearwood when it adopted Senate Bill 1437.
That defendants must wait until the resolution of their appeal before pursuing their petition does not deprive them of a remedy. As the Scarbrough court said about the same argument, "[b]y concluding there is no concurrent jurisdiction to resentence a defendant ..., we merely delay the resentencing; we do not preclude its application." ( Scarbrough , supra , 240 Cal.App.4th at p. 928, 193 Cal.Rptr.3d 125.) Defendants also do not establish that concurrent jurisdiction would result in judicial economy. The Scarbrough court's rejection of a similar argument applies with equal force here: "[C]oncurrent jurisdiction would not support judicial economy. Our efforts to review the initial judgment may be rendered futile; we may be asked to review conflicting judgments, each with different errors to be corrected; and the trial court may be asked to effectuate a remittitur against a judgment that has since been modified. These scenarios would lead to chaos, confusion, and waste-not judicial economy." ( Scarbrough , at p. 928, 193 Cal.Rptr.3d 125.)
Defendants further argue that to conclude the petition procedure is their exclusive remedy only affords them the right to new factual determinations about their liability by a sentencing court rather than by a jury, in violation of their constitutional right to a jury trial. This argument is unpersuasive because the retroactive relief they are afforded by Senate Bill 1437 is not subject to Sixth Amendment analysis. Rather, the Legislature's changes constituted an act of lenity that does not implicate defendants' Sixth Amendment rights. (See People v. Perez (2018) 4 Cal.5th 1055, 1063-1064, 232 Cal.Rptr.3d 51, 416 P.3d 42 [a trial court may make determinations of fact based on new evidence regarding a petitioner's eligibility for resentencing under Proposition 36 *1157 because retroactive application of the benefits from the proposition are a legislative act of lenity that does not implicate Sixth Amendment rights].)
Finally, defendants contend that certain language in Senate Bill 1437 indicates the court did not intend the petition procedure to exclude their right to raise their claims on direct appeal. They first point to section 1170.95, subdivision (f), which states, "This section does not diminish or abrogate any rights or remedies otherwise available to the petitioner." We disagree. The Conley court rejected such an argument based on the same language, as the court explained in Martinez : "The court in Conley rejected a similar argument concerning an analogous provision included in the text of Proposition 36, reasoning that provision 'contain[ed] no indication that automatic resentencing-as opposed to, for example, habeas corpus relief-ranks among the "rights" the electorate sought to preserve.' ( Conley , supra , 63 Cal.4th at p. 661, 203 Cal.Rptr.3d 622, 373 P.3d 435.) We reach the same conclusion here, where *545 there is no indication that reversal of a defendant's sentence on direct appeal without compliance with the procedures outlined in section 1170.95 was among the 'rights' the Legislature sought to preserve in enacting Senate Bill 1437." ( Martinez , supra , 31 Cal.App.5th at p. 729.)
Defendants also point out that section 1170.95, subdivision (a) merely states that a person "may" file a petition in the sentencing court. But this was also true of the statutes addressed in Conley and DeHoyos . (§ 1170.126, subd. (a) [Prop. 36], cited in Conley , supra , 63 Cal.4th at p. 655, 203 Cal.Rptr.3d 622, 373 P.3d 435 ; § 1170.18, subd. (a) [Prop. 47], cited in DeHoyos , supra , 4 Cal.5th at p. 598.) That defendants have the choice of seeking trial court relief does not suggest they may seek relief on appellate review of their original convictions.
Defendants also point to the instruction contained in section 1170.95, subdivision (d)(3) that, "[i]f the prosecution fails to sustain its burden of proof, the prior conviction ... shall be vacated" (italics added) as a further indication that the petition procedure was not intended to apply to their non-final cases, since the term "prior conviction" usually means convictions that are final. Defendants provide no authority for this proposition, which is unpersuasive. We must read the statute " 'as a whole' " and " 'harmoniz[e] the various elements by considering each clause and section in the context of the overall statutory framework.' " ( People v. Francis (2017) 16 Cal.App.5th 876, 885, 224 Cal.Rptr.3d 657.) Doing so here, we note that the Legislature used the phrase "prior conviction" in section 1170.95 only once, in subdivision (d)(3), otherwise referring to convictions without signaling finality. Further, it clearly indicated in the opening paragraph of the statute, section 1170.95 subdivision (a), that "[a] person convicted ... under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner" without qualification. We see no reason to adopt *1158 defendants' interpretation of the phrase "prior conviction" in this context. Also, it is reasonable that the Legislature would have been more explicit if it intended this petition procedure to be limited to defendants whose convictions were final in light of the Legislature's presumed knowledge of our Supreme Court's decisions holding very similar petition procedures applied to defendants with non-final convictions in Conley and DeHoyos . (See Scarbrough , supra , 240 Cal.App.4th at p. 928, 193 Cal.Rptr.3d 125.)
In short, defendants' contention that we should consider their claims for retroactive relief under Senate Bill 1437 in this appeal lack merit. Defendants must first raise these issues before the sentencing court by petition, as provided for in section 1170.95. Accordingly, although in several of the subparts that follow, we address issues raised by defendants that implicate the natural and probable consequences doctrine, we discuss this doctrine only as it existed at the time of trial.
XII.-XIX.††
DISPOSITION
The judgments appealed from are affirmed, except that we remand to the trial court to give it the opportunity to exercise its discretion regarding its imposition of a consecutive 25-years-to-life enhancement sentence on each defendant for the use of a firearm in violation of section 12022.53, subdivision (e) and regarding its imposition of a consecutive 5-year enhancement sentence on each of Price and Campbell for a *546 prior serious felony conviction under section 667, subdivision (a). The court should issue an amended abstract of judgment and provide a copy to correctional authorities with any changes to sentencing.
We concur.
KLINE P.J.
MILLER, J.

All statutory references are to the Penal Code unless otherwise stated.

The record of this trial is voluminous. We summarize in this opinion only the evidence and procedural history necessary for resolution of this appeal.

Hereafter we refer to Charles Davis and Jermaine Davis by their first names to avoid confusion, and mean no disrespect by doing so.

Berkeley Police Officer Susan Lee testified that she saw Anthony was driving the Cadillac as she pursued it after the shooting. The prosecutor asserted in closing argument that "there were people trading spots in that car," although McCluskey testified he did not see anyone trade places.

See footnote *, ante .

For clarity's sake, we will refer to Bao Ngo as "Bao" to differentiate him from Nguyen Ngo, who was his brother. We shall refer to Nguyen Ngo as "Ngo." We mean no disrespect by doing so.

The court reviewed the recording and a transcript of it for the hearing on the defense motions. Also, a transcript provided to the jury is contained in the record. We quote from this transcript.

The court reviewed the recording and a transcript of this May 17 interview for the hearing on the defense motions we address here.

The transcript identifies "Thurgood" as "[Jermaine Davis] ." The source of this identification in bold is not indicated, but it does not appear that Anthony identified him by this name in the interview, since Anthony said he thought the man's real name was "Thurgood."

The sources of these identifications in bold also are not indicated in the transcript.

The transcript includes identifications of "Rob" as "[Robert Benjamin] " and Stevie as "[Stevie Bailey] ." It is unclear from the transcript who provided these identifications.

There was evidence separate from Anthony's May 18 statements to Oakland police that Berkeley gang members and Jermaine, Charles's brother, were suspected of killing Ngo. Fleming testified that his investigation uncovered as suspects in Ngo's killing four men, Jermaine Davis, Coleon Carroll, Joseph Carroll and Greg Fite, whose nickname was " 'Na Na.' " Fleming said they all were "suspected gang members from Berkeley." Jermaine and Charles's sister testified at trial that Jermaine and Charles were brothers.

See footnote *, ante .

At the beginning of the hearing, the court stated that to the extent it indicated throughout the hearing that there was "no dispute about an item, essentially, I'm referring to the foundational issues that then had to be satisfied for the item to come into evidence, not to any earlier objections that had to do with [Evidence Code section] 352, prejudice, cumulative, et cetera. If those have been made, they are preserved for the record. [¶] But we do have a whole bunch of items ... all those previous objections notwithstanding, there is no dispute as to at this time." The court proceeded to admit the exhibits Cunnie commented on that we will soon discuss. Defendants do not now raise issues about their admissibility beyond those we will discuss.

Our Supreme Court has held that testimonial statements "must be made with some degree of formality or solemnity" and have a "primary purpose" pertaining in some fashion to a criminal prosecution. (People v. Edwards (2013) 57 Cal.4th 658, 705, 161 Cal.Rptr.3d 191, 306 P.3d 1049.)

The reporter's transcript indicates the prosecutor referred to this photograph both as exhibit "263" and "63," and Price's counsel referred to exhibit 263 as well. The record indicates this photograph is exhibit 63. The exhibits list of the reporter's transcript for the relevant volume identifies exhibit 63 as "Color photograph of drawing taped to a wall," while it identifies exhibit 263 as "Bel Harbour Police Department report."

As we will discuss, Cunnie should not have testified about this case-specific hearsay under Sanchez , but he could rely on it to state his opinion about defendants' gang membership. (Sanchez , supra , 63 Cal.4th at p. 685, 204 Cal.Rptr.3d 102, 374 P.3d 320.)

Cunnie's testimony about NSO's primary activities was presented to establish that NSO qualified as a "criminal street gang" as defined by section 186.22, since gang allegations (e.g., §§ 186.22, subd. (b); 190.2, subd. (a)(22); 12022.53, subd. (e) ) apply only where a gang so qualifies. A criminal street gang is in relevant part "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities" the commission of one or more of the criminal acts enumerated in section 186.22, subdivision (e)(1) to (25) or (31) to (33) and whose members engage or have engaged in a "pattern of criminal activity." (§ 186.22, subd. (f).) A "pattern of criminal gang activity" is "the commission of, attempted commission of, conspiracy to commit, or ... conviction of two or more of" the enumerated offenses, which include burglary and unlawful homicide, where one occurred after the effective date of the statute and the last "occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (§ 186.22, subd. (e)(3), (11).) It need not be proved that the predicate offenses used to establish this pattern of criminal activity were gang related. (People v. Gardeley , supra , 14 Cal.4th at pp. 621-622, 59 Cal.Rptr.2d 356, 927 P.2d 713, disapproved on another ground in Sanchez , supra , 63 Cal.4th at p. 683, fn. 13, 204 Cal.Rptr.3d 102, 374 P.3d 320.) Further, evidence of present criminal acts is admissible to establish the "primary activities" requirement. (People v. Sengpadychith (2001) 26 Cal.4th 316, 323, 109 Cal.Rptr.2d 851, 27 P.3d 739.) Even if Flowers had shown that Cunnie's "primary activities" testimony was based on inadmissible police reports, any error in admitting it would have been harmless. Other evidence, including Anthony's 2007 burglary conviction and defendants' murders of Charles, Perea and Ross, established NSO's status as a criminal street gang, and this part of Cunnie's testimony was therefore cumulative.

Also, Flowers claims on appeal that Cunnie's testimony about his 2008 arrest for possession of marijuana for sale and possession of a submachine gun should have been excluded under Evidence Code section 352 because it was overly prejudicial to him. We do not address this argument in light of our conclusion that this evidence should have been excluded as case-specific hearsay. However, Flowers's 2008 conviction for possession of marijuana for sale was established by certified court documents that were admitted elsewhere during trial. Further, those court documents indicate Flowers had weapons when he was taken into custody, as they include the court's pronouncement at sentencing that "[d]efendant's weapons and ammunition are ordered destroyed."

The parties do not indicate that there is any evidence one way or the other about any of these three defendants' cell phone communications with Campbell, whose phone was not among those recovered at the time police apprehended Price and Anthony.

Regardless of Cunnie's hearsay testimony about Ngo's membership in NSO, Ngo's membership in NSO is apparent from Anthony's April 23, 2009 statements to police and from exhibits Cunnie testified about that were admitted elsewhere during the trial, which we have already discussed.

As we have discussed, the court erred by admitting Anthony's May 18, 2009 statements to Oakland police in violation of Anthony's Miranda rights; therefore it was also error to allow Cunnie to testify about these statements. However, for the reasons we have already stated, the erroneous admission of this evidence was harmless as to Anthony, as well as to the other defendants. Cunnie's testimony about these statements is harmless for the same reasons.

See footnote *, ante .

The Legislature subsequently made statutory changes to the application of the natural and probable consequences doctrine to both first and second degree murder in Senate Bill 1437, which went into effect on January 1, 2019. Defendants raise claims regarding the retroactive application of those statutory changes to their three murder convictions, which we discuss in the next subpart.

The People concede Anthony, Price and Campbell have not forfeited their Chiu claims by not raising them below because the court's instructional error implicates their substantial rights. Therefore, we address the merits of the Chiu claims.

The jury also found true the special circumstance allegation that Flowers murdered Charles while an active participant in NSO and that the murder was carried out to further the activities of a criminal street gang. The jury was instructed under CALCRIM No. 736 that to make this finding it had to find the actual killer "intentionally killed Charles Davis."

Anthony also argues that the prosecutor argued to the jury that the premeditated and deliberate murder of Charles could have been a probable and foreseeable consequence of an intention to aid and abet, or conspire to commit, second degree murder. The record does not support his characterization. Rather, the prosecutor suggested briefly that second degree murder could be the probable and foreseeable consequence of an assault.

We discuss the issues raised by "defendants" in this section without identifying which defendant raises which issue, or which defendant makes a particular argument in support of an issue, because all of the defendants either raise the issues we discuss or join in them as raised by other defendants. Specifically, Flowers has submitted extensive briefs that at the very least touch on these issues. Anthony joins in the Senate Bill 1437 arguments made by the other defendants, and Price does the same. Campbell joins in the reply brief arguments made by Flowers and Price and the opening brief arguments made by Anthony.

These cases include Lara , supra , 4 Cal.5th at pp. 307-310, 228 Cal.Rptr.3d 394, 410 P.3d 22, People v. Robbins (2018) 19 Cal.App.5th 660, 678-679, 228 Cal.Rptr.3d 468, People v. McKenzie (2018) 25 Cal.App.5th 1207, 236 Cal.Rptr.3d 533, People v. Garcia (2018) 28 Cal.App.5th 961, 971-973, 239 Cal.Rptr.3d 558, People v. Eagle (2016) 246 Cal.App.4th 275, 200 Cal.Rptr.3d 773, People v. Ramos (2016) 244 Cal.App.4th 99, 197 Cal.Rptr.3d 738, People v. Wright (2006) 40 Cal.4th 81, 90, 94-95, 51 Cal.Rptr.3d 80, 146 P.3d 531, People v. Rossi (1976) 18 Cal.3d 295, 302-304, 134 Cal.Rptr. 64, 555 P.2d 1313, People v. Gutierrez (2014) 58 Cal.4th 1354, 1384-1387, 171 Cal.Rptr.3d 421, 324 P.3d 245, People v. Nasalga , supra , 12 Cal.4th at p. 791, 50 Cal.Rptr.2d 88, 910 P.2d 1380 (plur. opn. of Werdegar, J.), People v. Millan (2018) 20 Cal.App.5th 450, 455-456, 228 Cal.Rptr.3d 647, People v. Zabala (2018) 19 Cal.App.5th 335, 344, 227 Cal.Rptr.3d 878, People v. Francis (1969) 71 Cal.2d 66, 75 Cal.Rptr. 199, 450 P.2d 591, People v. Arredondo (2018) 21 Cal.App.5th 493, 506-507, 230 Cal.Rptr.3d 380, People v. Wood (2018) 219 Cal.App.5th 1080, People v. McKenzie (2018) 25 Cal.App.5th 1207, 236 Cal.Rptr.3d 533, People v. Buycks (2018) 5 Cal.5th 857, 236 Cal.Rptr.3d 84, 422 P.3d 531, People v. Garcia (1984) 36 Cal.3d 539, 205 Cal.Rptr. 265, 684 P.2d 826, People v. Garewal (1985) 173 Cal.App.3d 285, 297, 218 Cal.Rptr. 690 and In re C.E.M. (1970) 13 Cal.App.3d 75, 77, 91 Cal.Rptr. 382.

See footnote *, ante .